FREEMAN CLARKE *v.* THE CITY OF ROCHESTER.

The act to amend the charter of the city of Rochester, passed July 5, 1851, including sections 285 to 291 inclusive, which authorize the city corporation, upon certain conditions, to subscribe for, and become the purchaser of stock in the Rochester and Genesee Valley Rail Road Company to the amount of $300,000; to issue the corporate bonds for that sum; to dispose of the stock by sale; and to raise by taxation the money to discharge the interest of such bonds; was constitutionally passed, and is a valid and binding law.

That act, notwithstanding the provision that the above mentioned sections should not take effect until they had been submitted to the electors, for the purpose of determining whether or not it was expedient for the city to borrow the money for the purpose specified therein, was enacted by the legislature, and not by the people of Rochester; and the subscription for the stock, and the issuing of the bonds, by the corporation, in pursuance of the authority given by the statute, were valid acts.

While general statutes must be enacted by the legislature, it is plain the power to make local regulations, having the force of law in limited localities, may be committed to other bodies representing the people in their local divisions, or to the people of those districts, themselves.

The electors of a city or village may be made the depositaries of such powers of local government as the legislature may see fit to prescribe, and the exercise of which is not repugnant to any of the general arrangements of the constitution.

A contract, between the city of Rochester and C., dated March 2, 1853, recited that the city had subscribed for, and obtained, the $300,000 worth of stock in the Rochester and Genesee Valley Rail Road Company, as

authorized by the act of July 5, 1861. The city then agreed to sell, and C. agreed to purchase, the whole of said stock at $300,000, payable $20,000 down, and $2000 on the 1st day of January, in each year thereafter, for twenty years, and the whole residue on the 1st day of January, 1873, with interest at six per cent, payable semi-annually. The city was to issue to C. corporate bonds to the amount of $180,000, for which he was to pay them the amount, in money, as they should be issued. The city was to retain the title to the stock, and the scrip, and to have all the rights of a stockholder, but C. was to have all the dividends made by the rail road company. C. was entitled to anticipate his payments on surrendering an equal amount of bonds, and might then call for a transfer of a proportionate amount of stock. A failure by him to perform, in any respect, was, at the election of the city, to involve a forfeiture of the contract and all payments made by him. The bonds issued were, and those to be issued were to be, on interest, at the rate of six per cent.

*Held* that this contract was not void on the ground that the common council, in entering into it, had exceeded the authority given to them by the act of the legislature; or that it contained provisions not warranted by the statute.

THIS was an action brought to recover the sum of about $41,740, paid for principal and interest by the plaintiff upon a contract for the sale to him by the defendant, of three thousand shares of the stock of the Rochester and Genesee Valley Rail Road Company, issued under and in pursuance of an act to amend the charter of the city of Rochester, passed July 3, 1851, upon the ground that the act, so far as it authorizes the defendant to subscribe for, or dispose of the stock in question, or issue the bonds mentioned in the contract, was unconstitutional and void. The defendant's answer took issue upon the facts stated in the complaint, and set up as a defense certain counter claims, the particulars of which it is unnecessary to state. The action was tried before Mr. Justice JOHNSON at the Monroe circuit, on the 26th day of October, 1857, without a jury, and the following facts were proved. The plaintiff introduced a contract between him and the defendant, the execution of which was admitted, in the words and figures following, that is to say: "This agreement, made the second day of March, in the year 1853, between the city of Rochester, of the first part, and Free-

man Clarke, of the city of Rochester, of the second part, witnesseth:

Whereas, by chapter 389 of the session laws of the state of New York, for the year 1851, the common council of the said city of Rochester was authorized to borrow, on the faith and credit of said city, any sum of money not exceeding three hundred thousand dollars, and to execute bonds therefor, under certain conditions and restrictions, and to invest the money so borrowed in the capital stock of the Rochester and Genesee Valley Rail Road Company, and in the corporate name of said city, to subscribe for or purchase of said company, stock to the amount of the said sum of three hundred thousand dollars. And the said common council having determined to borrow said sum of three hundred thousand dollars, and to execute the bonds of the said city to that amount therefor, and having actually executed such bonds to the amount of one hundred thousand dollars, bearing date the first day of January, 1853, and obtained the money thereon; and having also, in pursuance of said act, subscribed for the stock of said company, to the amount of three hundred thousand dollars—being three thousand shares of one hundred dollars each share—and the party of the first part having thereby become entitled to such stock upon payment to said company of the amount of said subscriptions, or such part thereof as the said company shall require to be paid:

Now, therefore, the party of the first part hereby agrees to sell and convey to the party of the second part, on or before the first day of January, 1873, the said three thousand shares of stock, and to make and execute to the party of the second part, all assignments, transfers and conveyances necessary to assure the same to him, his heirs and assigns. In consideration hereof, the party of the second part agrees to pay to the party of the first part the full sum of three hundred thousand dollars, as follows: Twenty thousand dollars in money down; two thousand dollars on the first day of January, 1854, and a like sum on the first day of January in each year thereafter,

for and during twenty years from the date hereof; and the residue of the said sum of three hundred thousand dollars on the first day of January, in the year 1873, with interest at the rate of six per cent per annum on all sums unpaid, semi-annually, on the first days of January and July, in each year—all payable at the Merchants' Bank in the city of New York, unless the common council shall designate a different place in the city of New York, and give notice thereof to the party of the second part; such interest to be computed on the sum of one hundred thousand dollars from the first day of January last past, for which sum the party of the first part has already issued bonds as aforesaid, bearing interest at the rate of six per cent per annum; and on the residue from such time or times and on such sums as the party·of the first part shall from time to time pay to the said rail road company on the said subscription of stock.

And it is mutually agreed by and between the said parties to this agreement, that the bonds of the party of the first part, to the amount of one hundred and eighty thousand dollars, shall be executed to the party of the second part, or such person or persons as he shall direct, bearing interest at the rate of six per cent per annum, payable semi-annually, and at such times and in such amounts as the common council shall determine; and the party of the second part is to pay the party of the first part the full amount of such bonds in money, at such time or times, and as fast as the same shall be executed as aforesaid; and all net premiums received by the party of the first part on the one hundred thousand dollars of bonds heretofore issued and sold, after deducting all expenses that have been incurred by the party of the first part, growing out of the said subscription to the said capital stock, including the issuing and sale of the bonds already issued, and the expenses of this agreement, are to be paid over by the party of the first part to the party of the second part, on demand, so that the sale of the whole amount

of bonds authorized by chapter 389 of the session laws aforesaid shall be, when taken together, a sale at par.

And it is further agreed, that forty thousand dollars of the said last mentioned bond to be executed to the party of the second part as aforesaid, shall be divided into twenty bonds of two thousand dollars each, and be made payable respectively on the first day of January, 1854, and on the first day of January in each year thereafter, to and including the first day of January, 1873, with interest at the rate of six per cent per annum, payable semi-annually as aforesaid, at the Merchants' Bank in the city of New York. The residue of said bonds, amounting to one hundred and forty thousand dollars, are to be made payable on the first day of January, 1873, with interest at the rate of six per cent per annum, semi-annually, at the said Merchants' Bank in the city of New York.

And it is further agreed, that in case the said party of the second part shall at any time before the first day of January, 1873, elect to pay off the whole or any part of said principal and interest, which shall then remain due and unpaid to the party of the first part for said rail road stock, and take a transfer thereof, or such part thereof as shall be equal to the amount of principal he shall pay, he shall have the right to do so, upon surrendering to be canceled all the aforesaid bonds of the party of the first part which shall then have been issued and be then outstanding and unpaid, or an amount of such bonds equal, at par valuation, to the amount of stock which he shall desire to have transferred to him, and the party of the second part shall be allowed the amount of such bonds so surrendered, at their par valuation, with all arrears of interest thereon.

And it is further agreed, that the party of the first part shall hold and retain all the aforesaid rail road stock, and all certificates thereof or relating thereto, which have been or shall be issued by said railroad company, and the said stock

shall remain upon the books of the said company, in the name of the party of the first part; and the party of the first part shall have and exercise all the rights, powers, and privileges in respect to said stock, conferred upon the party of the first part or common council of the city of Rochester, by chapter 389 of the session laws aforesaid, the same as if this agreement had not been made, until a final transfer of said stock shall be made to the party of the second part by the party of the first part, in pursuance of the provisions of this agreement. Provided, that so long as the party of the second part shall perform and fulfill all and singular the aforesaid covenants and agreements on his part to be performed and fulfilled, all dividends or income to which the party of the first part, as the holder of said stock, may be entitled from the earnings or revenue of said railroad, shall be paid by the party of the first part to the party of the second part.

And it is further agreed, that in case the party of the second part shall in any respect fail to keep and fulfill his part of this agreement, as herein provided, this agreement shall be void at the election of the party of the first part, to be signified in writing to the party of the second part; in which case all previous payments made by the party of the second part shall be forfeited to the use of the party of the first part, or the party of the first part may prosecute an action or actions, or pursue any other legal remedy against the party of the second part to enforce performance by him of the aforesaid agreements and covenants on his part to be performed and fulfilled, as herein provided, or to recover damages for the non-performance thereof.

Seal of the mayor and
  common council of the        H. STILWELL, *Mayor.*
  city of Rochester.           FREEMAN CLARKE." [L. S.]

It was conceded that the rail road referred to in the foregoing contract, is a road commencing at the city of Rochester, and running southerly along the valley of the Genesee river, and, when completed, is to terminate at Portage, in

the county of Allegany. The plaintiff then proved the payment by him to the defendant, of the following sums upon the foregoing contract, viz: On the 2d day of March, 1853, and at the execution of the contract, the sum of twenty thousand dollars; on the 1st day of July, 1853, three thousand dollars; on the 28th December, 1853, ten thousand four hundred dollars; and on the 29th of June, 1854, eight thousand three hundred and forty dollars. The plaintiff then proved, that on the 20th of December, 1854, the plaintiff rescinded the said contract, and demanded from the defendant the repayment of these sums, with the interest thereon, by serving on the mayor the following notice and demand:

"*To the city of Rochester :* I am advised that the contract made by the city of Rochester with me, dated 2d March, 1853, for the sale to me of certain stock in the Genesee Valley Rail Road Company, and for other purposes, is void, for the reason that the city corporation could not lawfully acquire any title to the stock in question, and for want of authority to make the contract. That the contract, and the acts of the city in subscribing for the stock, are forbidden by law, and are void. It follows that the money which I paid the city on the contract, was paid without any consideration, and I therefore request that the same may be refunded to me, with the interest thereon.          FREEMAN CLARKE.

December 20, 1854."

The defendant proved, that the plaintiff, on the 23d of March, 1853, received from the defendant $4655, for the premium on the first one hundred thousand of bonds issued and sold by the defendant, as stated in the contract. That on the 4th of February, 1854, the plaintiff received from the Genesee Valley Rail Road Company $11,386.67, upon the order of the defendant, for the interest allowed by the company on the money paid in upon the said 3000 shares of stock; and that on the 29th of June, 1854, the plaintiff re-

ceived $10,500 upon the like order and for like interest. The defendant then proved, that sections 285 to 292 inclusive, of the act to amend the charter of the city of Rochester, passed July 3, 1851, were published in the manner prescribed by section 291. The defendant then proved by oral evidence, and by the testimony of the persons who attended the election and voted thereat, and by the returns of the inspectors of election in the several wards of said city, that an election was had in the city of Rochester, on the 30th day of September, 1851, as prescribed by said section 291, and that the aforesaid sections were approved by two thirds of the votes of the electors of said city voting at such election. To this evidence the plaintiff in due time objected, which objection was overruled and the plaintiff excepted. The defendant then proved by Mr. Shepardson, that immediately after said election he was clerk of the city of Rochester, in 1851; that the mayor and himself canvassed the votes held at such election, and made a certificate, as prescribed by the said section, and filed the same in the city clerk's office, and that he saw the same there afterwards. To this evidence the plaintiff in due time objected, and the objection was overruled, and the plaintiff excepted. The defendant then proved by Mr. Simmons, the present clerk of the city, that on search in the office the certificate could not be found. The foregoing is all the evidence given in the case.

The judge, upon the evidence, found the following facts and conclusions of law, that is to say: That, on the 2d day of March, 1853, the plaintiff entered into a contract with the defendant, for the purchase of three thousand shares of the capital stock of the Genesee Valley Rail Road Company, which the defendant had subscribed for, and taken under and pursuant to section 286 of chapter 389 of the laws of 1851; a copy of which contract is hereinbefore set forth. That pursuant to the stipulations of said contract, the plaintiff paid to the defendant, on the said 2d day of March, 1853, the sum of $20,000; on the 1st day of July, 1853, the sum

of $3000 ; on the 28th day of December, 1853, the sum of $10,400; and on the 29th of June, 1854, the sum of $8,340. That on the 20th day of December, 1854, the plaintiff rescinded the said contract, and demanded from the defendant the repayment of the said several sums of money, and the interest thereon. That the defendant, on the 23d day of March, 1853, paid to the plaintiff the sum $4655, for the premiums received by the defendant, (after deducting expenses,) on the sale of $100,000 of the bonds of the city of Rochester, as provided by the said contract. That on the 4th day of February, 1854, the plaintiff received from the Genesee Valley Rail Road Company, upon the order of the defendant, the sum of $11,386.67; and on the 29th day of June, 1854, the further sum of $10,500, for interest upon the money paid by the defendant to the said company, on account of the said three thousand shares of stock. That on the 30th day of September, 1851, an election was held in the city of Rochester, pursuant to section 291 of the said act, and the sections 285 to 292 of the said chapter 389 were approved by the vote of two thirds of the electors of said city, voting at said election. That the votes at the said election were thereupon immediately canvassed by the mayor and clerk of said city, and a certificate thereof filed in the office of the said clerk, as directed by the said act, which certificate is lost. And as conclusions of law, from the foregoing facts, the judge found and determined that the sections 285 to 292 inclusive, of the act aforesaid, became a valid law of the state on the day of making and filing the certificate of the mayor and clerk of the city of Rochester before referred to ; and that the subscription of the city of Rochester, and the taking by the said city of the three thousand shares of the stock of the Genesee Valley Rail Road, was a valid and binding subscription, and that the city became rightfully and lawfully entitled to the said stock. That the contract of said city with the plaintiff, annexed to the defendant's answer, for the sale to him of said stock, was and is a valid contract, and in conformity with

the authority given by the said act. That the plaintiff was not entitled to recover anything in this action. The said judge therefore decided and determined, that the defendant was entitled to judgment against the plaintiff for the costs of the action, and did order judgment accordingly.

To the foregoing finding of his honor the justice, before whom the cause was tried, the plaintiff excepted, and appealed to this court from the judgment. (See 24 Barb. 446, S. C.)

*S. E. Church,* for the appellant.

I. The contract between the parties was and is void, because the sections of the act conferring the power, and in pursuance of which it was made, were never constitutionally passed by the legislature. (Chapter 389, Laws of 1851, §§ 285 to 292, inclusive.) 1. Previous to the alleged passage of this act, the city of Rochester had no power to subscribe for or purchase stock in the Genesee Valley Rail Road Company, borrow money to pay for it, or make the contract in question. It was under a disability which it required *legislation* to remove. (*Gould* v. *Town of Sterling*, 23 N. Y. Rep. 456, per Selden.) 2. It is not competent for the legislature to submit the question of the passage of a law, or any of its provisions *in any form*, to the whole people or any portion of them. All legislative power is vested in the senate and assembly. (Const. 1846, art. 3, sec. 1.) The responsibility of every act rests with the members of the legislature. To them is confided the duty of determining as to the propriety and policy of every law, and they can neither delegate their power nor shrink from the responsibilities of their position. No part of the law making power was reserved by the people; it was all conferred upon the legislature, and must be fully and completely exercised by it. This principle was expressly decided by this court in *Barto* v. *Himrod*, (4 Seld. 483,) and has since been recognized and reiterated in *The Bank of Rome* v. *The Village of Rome*, (18 N. Y. Rep. 38, and

*Gould* v. *Town of Sterling*, (23 N. Y. Rep. 439, 456.)    And
upon this point there is perfect uniformity of authority
wherever similar constitutions exist.    (*Rice* v. *Foster*, 4 Har.
479 ; *Cin. W. & Z. R. R. Co.* v. *Com. of Clinton*, 1 McCook,
77 ; *Slack* v. *M. & L. R. R. Co.* 13 B. Monroe, 1 ; *Moers* v.
*City of Reading*, 21 Penn. 188 ; *Parker* v. *Commonwealth*,
6 Barr, 507 ; *Mesheimner* v. *State*, 11 Ind. 482 ; *Thorne* v.
*Cramer*, 15 Barb. 112–122 ; *Grant* v. *Courter*, 24 Barb.
232–242.)    3. It has also been determined that a law which
is made *to take effect* upon receiving a specified popular vote
it its favor, comes within the principle above stated, and is
invalid, but that an act conferring power or privileges upon
a city or town is not invalid by reason of a provision sub-
mitting the question to a popular vote, whether the power
shall be exercised or the privileges accepted or not.    (Same
authorities.)    In *Barto* v. *Himrod*, 4 Seld. 490,) the court
say : " But if, by the terms of the act, it has been declared
to be law from the time of its passage, to take effect in case
it should receive a majority of votes in its favor, it would
nevertheless have been invalid, because the result of the pop-
ular vote upon the expediency of the law is not such a future
event as the statute can be made to take effect upon, accord-
ing to the meaning and intent of the constitution."    And
in this case, in the Supreme Court, Judge STRONG, who de-
livered one of the prevailing opinions, while laboring to find
a distinction between this case and *Barto* v. *Himrod*, says :
" Such a distinction does not, I believe, arise from the cir-
cumstance that in the free school law the language was that
the electors of the state should determine whether this act
'shall or shall not become a law,' and in case a majority
should be against it, the act 'shall be null and void,' and
that in the case of the present legislation the language is that
the sections 'shall not take effect' until they should be sub-
mitted to the electors of the city, and upon the event therein
mentioned.    The expressions differ only in form ; they import
the same idea in substance.    An act does not become a law

:—a rule of action for the community, or company, or individuals—until it takes effect; and when it takes effect it is a law." (24 Barb. 498.) In 23 N. Y. Rep. 447, Judge LOTT says: "In the case under consideration the act, as before stated, by its terms took effect immediately, but parties to be affected by it were at liberty to accept the privileges granted, and incur the burden and obligations it would impose, as their interest or will should dictate." And, at page 456, Judge SELDEN says: "It was not submitted to the people of the town *in any form,* whether the act or any portion of it should take effect. All that was submitted to them was the prudential question, whether it was expedient to avail themselves of the power which the statute conferred." To the same effect is *Grant* v. *Courter,* (24 Barb. 234,) per WRIGHT, J. It would seem therefore, after the repeated adjudications of this court, only necessary to ascertain under which class of legislation this act belongs. It is insisted by the appellant that the act in question clearly belongs to the prohibited class, according to the principles adjudicated and settled by this court. 1. The policy of conferring power upon the city of Rochester to take stock in the Genesee Valley Rail Road, of borrowing money and issuing bonds to pay for it, regulating and directing the manner in which it should be done, and authorizing taxes to be imposed upon the people, required the determination of legislative questions which the legislature were bound definitively to decide. (*Rice* v. *Foster,* 4 Har. 479, and cases before cited.) 2. The language of sections 291 and 292 is clear and explicit, and is incapable of any other construction than that all the sections in question were dependent for existence upon the vote of the people of the city. Section 291 of the sections in question declares that "The preceding sections 285, 286, 287, 288, 289, 290, of this act, together with this section, *shall not take effect* until they shall have been submitted to the electors of the city of Rochester, *      * for the purpose of determining whether or not it is expedient for said city to borrow the money mentioned in said sections

for the purposes therein specified." "§ 292. If said sections 285, 286, 287, 288, 289, 290, 291, shall be approved by two-thirds of the votes of the electors of said city, and voting at such election as above prescribed, *then the same shall take effect from the filing of the certificate of such approval* of the said act by the said mayor and clerk of said common council." If two-thirds of those voting had not been in the affirmative upon the question presented, the sections in question would *never have taken effect*. No part of them would have been law. The non-approval of two-thirds would have defeated them as effectually as if a majority of the legislature had voted against them. 3. The form of the question voted upon was of no importance—whether it was "rail road" or "no rail road," "law" or "no law." The point is, "what did the voting determine?" Did it determine whether the city should exercise the power, or whether there should be no power? Whether the privileges should be accepted, or whether there should be no act conferring power or granting privileges? 4. Nor is the declaration in the 291st section, that it should be submitted to the people for the purpose of determining whether or not it is expedient for the city to borrow the money for the purposes specified, of the slightest moment, inasmuch as the existence of the law is made to depend on the result of the voting. It is as incompetent for the legislature to submit the question of the exercise of a power to the people, if the result of that submission determines whether the act is to exist or take effect or not, as to submit directly the law itself. Otherwise the constitution could be violated with impunity, by simply changing the form of the submission, while the declared effect would be the same. Suppose the free school act had submitted to the people of the state the question whether the money authorized by the act should be raised, and then declared that if a majority voted in the affirmative the act should be a law, if not, it should be void: Could it be said that the act itself was not in reality submitted to the people? Courts look at

the substance and not the form of things.   5. The last section of the act, declaring that "this act shall take effect immediately," has no application to the sections in question. (*a.*) Because sections 291 and 292 fix a different time for these sections to take effect, and upon a certain contingency declare that they shall not take effect at all.   (*b.*) That section can and does apply to the other portions of the act, and there is, therefore, no necessary conflict between the sections on that subject.   6. The distinction between the terms of the act in this case, and the acts in those cases where this court has decided in favor of their constitutionality, is most manifest and significant, and the opinions delivered in those cases sustain the positions here taken.   In *Bank of Rome* v. *Village of Rome,* (18 N. Y. Rep. 38,) the act, chapter 283, Laws of 1853, authorized the trustees of the village of Rome to subscribe for stock in a rail road to the amount of $150,000, and provided as follows :

"§ 8. The board of trustees shall *have no power to make such subscription as is authorized in the first section of this act, nor to issue bonds or create any liability under this act* until it has been previously approved by two thirds of all the electors who shall have paid a tax on personal or real estate in said village, whose names shall appear regularly in the last village assessment roll for the year next preceding the one in which the vote is taken."

Another section provided: "And if it shall appear from such certificate that this act has been approved, and the issue of stock authorized, the president and trustees of said village shall *proceed to make such subscription, and to issue bonds as authorized by this act.*"   The difference in the two cases is most obvious.   (*a.*) The act was complete and took effect immediately.   (*b.*) The effect of voting was to determine simply whether the power conferred should be exercised.   If two thirds voted in the affirmative, the subscription was to be made ; not otherwise.   (*c.*) The non-approval of the act, according to section 8, did not affect the existence or vitality

of the act itself.   It only determined that the power should not be exercised.   ·(*d.*) In that case, if the people approved the act, they could exercise the power ; in this case, if the people determined to exercise the power, the act was to be a law, otherwise it was to be no law.   The court recognize this distinction, and decide substantially that the test in these cases is the effect which the vote is declared to have.   JOHN-SON, J., says : "The case is, therefore, in substance only a submission to a vote of the parties interested, of the question whether or not they chose that the municipal corporation should subscribe to the rail road."   In *Starin* v. *The Town of Genoa,* and *Gould* v: *Town of Sterling,* (23 N. Y. Rep. 439,) the acts, chapter 375, Laws of 1852, and Laws of 1851, p. 544, authorized the supervisors and assessors of certain towns in Cayuga county to borrow money and issue bonds therefor, and pay the same over to such rail road company as might be expressed by the written assent of two thirds of the tax payers of the town, &c., and it was provided *that the officers should have no power to do any of the acts author-ized by said law until the written assent* of the tax payers had been obtained.

This is clearly a case of submission, the effect of which was to determine whether the power should be exercised ; and the court so decide, but distinctly recognize the principle claimed by the appellant in this case.   7. The circumstance that in the free school act it was submitted to the whole people of the state, and in the act in question to a portion of the people only, can make no difference with the point under consideration.   If the legislature can not make a law dependent upon the vote of the whole people, it is clear that they can not of a portion.   They can delegate their power to all as well as a part.   (23 N. Y. Rep. 466, per Selden.) The opinion of Judge SMITH in this·case is based upon a misapprehension of the provisions of the act in question, and of the principles decided by this court in *Barto.* v. *Himrod,* and other cases cited.   He says the act "gave the power and

left it for the corporation, the body of the citizens, to deter-
mine that question for themselves. The act itself was com-
plete when it had passed the two houses of the legislature,
and received the signature of the governor. It was perfect,
final and decisive in all its parts. It imparted new power to
the corporation, which it might or might not exercise. It
left no matter to the discretion of the citizens of Rochester,
except what related to the execution of the law. The legis-
lature passed an act giving enlarged power to the common
council, subject to the acceptance, assent and approval of
the corporation. It is therefore a case of proper and legiti-
mate, if not necessary conditional legislation. It is the pre-
cise case mentioned by Judge RUGGLES in *Barto* v. *Himrod,*
of a statute which is a law *in presenti,* to take effect *in
futuro.*" If these assumptions of the provisions of the act
and of the principles determined by this court, were a correct
exposition of them, the conclusion of the learned judge would
be right. But they are manifestly erroneous. (*a.*) As we
have seen, the act was not perfect, final and decisive in all its
parts, but depended upon the vote of the people to make it
so. The assent and approval of the corporation determined
whether there should be any act or not, according to its terms.
(*b.*) The event upon which it was to take effect, was not such
as, according to the constitution, it could be made to depend
upon. Judge RUGGLES says it must be "an event on
which the expediency of the law, in the judgment of the law
makers, depends. On this question of expediency the legis-
lature must exercise its own judgment, definitively and
finally." The wisdom or expediency of conferring this extra-
ordinary power upon the city of Rochester, "abstractly con-
sidered, did not depend upon the vote of the people. If it
was unwise or inexpedient before that vote was taken, it was
equally so afterwards." Again: Neither one of the authori-
ties cited by Judge SMITH sustains his positions. On the
contrary, every one of them recognizes the principle contend-
ed for by the appellant. *Slack* v. *M. & L. R. R. Co.,* (13

B. Monroe, 1;) *Cin. W. & Z. R. R. Co.* v. *Com. of Clinton*, (1 McCook, 77;) *Moers* v. *City of Reading*, (21 Penn. Rep. 188,) are cases where the question of the exercise of power authorized was alone submitted, and were each of them sustained expressly on that ground.  *Rice* v. *Foster*, (4 Har. 479,) was a case where a law of the state of Delaware was declared unconstitutional on the identical ground claimed in this case, and the able opinion of the court fully sustains our position. *Talbot* v. *Dent*, (9 B. Monroe, 526,) was upon another question, viz. whether it was competent for the legislature to authorize a city to embark in rail road schemes.  Judge STRONG, who also delivered an opinion in favor of the respondent, places his decision upon entirely different grounds from Judge SMITH.  After expressing doubts upon the question, he thinks there is a distinction between this case and *Barto* v. *Himrod*, upon two points.  (*a.*) That the free school law was mandatory in its character and this act merely permissive.  Admitting, for argument sake, (not otherwise,) that the distinction exists between the two acts, it is submitted that there is not the slightest difference in principle upon the point in controversy.  It is as much a legislative question to determine whether an act should be authorized, as whether it should be directed to be done; whether permission is given or a mandate issued by the legislature.  Not one of the authorities countenance any such distinction.  (*b.*) The learned judge holds that the form of submission creates a distinction.  He says: "The approval was to be implied from a vote borrowing the money; it was not the question submitted."  This idea has already been sufficiently answered. The form of submission is of no consequence, but the effect which the submission has on the law itself; otherwise the constitutional provision might be entirely frittered away by a weak or corrupt legislature, by merely changing the form of putting the question.  On the other hand, Judge JOHNSON delivered a dissenting opinion, (24 Barb. 499,) which contains an unanswerable argument against the constitution-

ality of the sections in question, if the principles of *Barto* v.
*Himrod* are to be sustained.   Judge ALLEN, who first tried
the case, also delivered an opinion against the constitution-
ality of the act.   So that it is submitted that, so far as judi-
cial authority is entitled to weight in the decision of the case
by this court, it is at least equally as strong in favor of the
appellant as of the respondent.   8. It is submitted that le-
gislation of the character involved in this case is most inju-
rious and mischievous, and should be checked by this court.
(*a.*) The elections held under these acts are managed al-
ways by parties interested in the schemes to be promoted,
and if any opposition is evinced, it is smothered under the
delusive cry of self-interest.   (*b.*) Such legislation tends to
belittle the dignity and character of the law-making power—
to degrade the members of the legislative body, and enable
them to shirk from constitutional responsibilities—and, if
permitted, must change the character and theory of the gov-
ernment itself.   Upon this point judicial authority is en-
tirely uniform.   In 9 Barbour, 686, Judge JOHNSON, in an
opinion in favor of the constitutionality of the free school
act, says:   "I regard it as an unwise and unsound policy,
calculated to lead to loose and improvident legislation, and
to take away from the legislator all just sense of his high and
enduring responsibility to his constituents, and to posterity,
by shifting that responsibility upon others.   Experience has
also shown that laws passed in this manner are seldom perma-
nent, but are changed the moment the excitement under which
they are ratified has abated or reversed its current.   Of all
the evils which afflict a state, that of unstable and capricious
legislation is amongst the greatest."   In 15 Barbour, 117,
(*Thorne* v. *Cramer*,) by Judge BARCULO:   "If it were a
legitimate subject of investigation at this time, we think it
might be easily shown that some of the very worst evils must
necessarily flow from such a violation of the fundamental
law."   15 Barbour, 126, (*Bradley* v. *Baxter*,) by Judge
PRATT:   "It can not be necessary for me to go into an ex-

tended discussion of the importance of this representative
principle to a free government, and of the necessity of guard-
ing and cherishing it as the sheet anchor of the permanency
and stability of our free institutions, and of their efficiency
in securing the great object of all good governments, to wit,
the happiness and prosperity of the people." 4 Selden, 483,
by Judge WILLARD: "If this mode of legislation is per-
mitted, and becomes general, it will soon bring to a close the
whole system of representative government which has been so
justly our pride. The legislature will become an irresponsi-
ble cabal, too timid to assume the responsibility of law-giv-
ers, and with just wisdom enough to devise subtile schemes
of imposture to mislead the people." (*c.*) A significant
illustration of the slip-shod character of this legislation was
furnished at the trial of this action, in the fact that the
existence of the law had to be proved by parol. The certifi-
cate of the city officers, which by the terms of the act was to
give it vitality, had, as it was claimed, been lost.

II. The contract between the parties was void, because
the common council exceeded their authority under the act
in making it. Section 289 provides that the common coun-
cil "may dispose of such stock in their discretion to any
purchaser or purchasers, for cash, but shall not sell and dis-
pose of the same at less than par, except at public sale."
1. It is not disputed that this was a private sale. 2. The
sale was upon credit. The authority conferred was expressly
limited to a sale for cash, as distinguished from a sale upon
credit. This was also the evident intention of the act,
because in the same section the common council are required
to apply the proceeds of the sale to the *purchase* or redemp-
tion of the bonds to be issued by the act, and to no other pur-
pose. 3. But if the authority to sell had been silent upon
the question, the common council would have had no power
to sell on credit. They acted simply as agents, and were con-
fined in the execution of their agency to the terms of the law
or instrument creating it. (*State of Illinois* v. *Delafield,*

8 Paige, 540; *Delafield* v. *State of Illinois*, 26 Wend. 223; 1 Camp. 258; 2 Hill, 173; Story on Agency, §§ 76, 77, 78; *Starin* v. *Town of Genoa*, 23 N. Y. Rep. 439.) 4. The sale of the stock was for less than its par value, which was expressly prohibited by the act. The city had sold $100,000 of the bonds authorized to be issued, and had realized a premium of more than four and a half per cent, which the city agreed to pay over to Mr. Clarke, after deducting the expenses of making the sale. This premium amounted to $4655 over the expenses, which was paid by the city to Mr. Clarke. The effect of the arrangement was to sell to Mr. Clarke $300,000 of rail road stock, at $4655 less than par. Nor was this all. Mr. Clarke was to have the premiums on the balance of the stock to be issued. The presumption is that the remaining stock was worth the same premium as that sold. If so, the appellant was to receive by the contract more than $13,000 bonus for purchasing this stock. It is patent on the face of the contract, that the parties could have had no other object in providing for a sale of the bonds to the appellant than to give him the benefit of those premiums, because he was to pay the city at the time he received them the par value in cash. So that the effect of the arrangement was to let Mr. Clarke have $280,000 of the bonds of the city, worth 4½ per cent premium, at par, in consideration (in part) of his purchasing $300,000 of stock at par. It is too clear for argument, that this was a mere device to evade the requirement of the statute, and can not be sustained. (See authorities before cited.) If the appellant had loaned to the city $300,000 in cash, at seven per cent interest, and the same contract had contained the precise agreement about the purchase of bonds contained in this agreement, no court would hesitate to pronounce it usury. (*Seneca Co. Bank* v. *Schermerhorn*, 1 Denio, 133; *Colton* v. *Dunham*, 2 Paige, 267; *Cleveland* v. *Loder*, 7 Paige, 557; *Eagleson* v. *Shotwell*, 1 John. Ch. 536; *Stuart* v. *M. & F. Bank*, 19 John. 496; *N. Y. Life Ins. Co.* v. *Beebe,*

3 Seld. 364; *Seymour* v. *Strong*, 4 Hill, 255; 3 Comst. 344; 14 N. Y. Rep. 93.)  Besides the sale of the bonds could not be made for less than par.  (§ 286.)

III. If the contract was void for either of the reasons stated, the appellant has a right to recover back whatever he has paid upon it.  1. Because there was a total failure of consideration for which the payment was made.  (Chitty on Contracts, 622, 623; *Young* v. *Cole*, 3 Bing. N. C. 724; *Morgan* v. *Groff*, 4 Barb. 524; *Rice* v. *Peck*, 15 John. 503; *Gillet* v. *Maynard*, 5 id. 85; *White* v. *Franklin Bank*, 22 Pick. 181.)  The contract of the common council to sell this stock could never be enforced, for want of authority to make it.  (*Delafield* v. *Illinois, supra*.)  Nor could the city ratify it, for the same reason.  (*Ib.*)  2. In such cases it is the right of the vendee to rescind the contract and recover the money back, especially so long as the contract remained executory.  (*Rodman* v. *Munson*, 13 Barb. 188; *Newell* v. *The People*, 3 Seld. 9; Chitty on Contracts, 636, 637, and cases before cited.)

*T. R. Strong*, for the respondent.

I. The finding of the justice, that an election was held in the city of Rochester on the 30th of September, 1851, pursuant to section 291 of the act to amend the charter of the city of Rochester, passed July 3, 1851, (Laws of 1851, p. 767,) and that sections 285 to 292 of the said act were approved by two-thirds of the votes of the electors of said city voting at said election, was correct, and upon competent and sufficient evidence.  It is stated in the case that these facts were "proved by oral evidence, and by the testimony of the persons who attended the election and voted thereat, and by the return of the inspectors of election," &c.  The objection to the evidence was general, no ground being specified.  It was not objected that oral evidence was not admissi-

ble, or stated in what respect the evidence was not competent or sufficient. No ground for the objection is perceived.

II. The evidence by the oral testimony of the clerk of the city, of the canvassing of the votes by the mayor and himself, and the making and filing by them of a certificate of the result of the election, &c., as prescribed by said section, (291,) was competent. It was not objected that it was not the best or secondary evidence, or that parol evidence was not admissible. It was proved that on search by the city clerk, in his office, the certificate could not be found. The parol evidence was proper and ample.

III. Section 292 of said act went into effect immediately upon the passage of the act, and conferred full authority upon the city for the holding of the election and the proceedings relating thereto, prescribed by the next preceding section. The conclusion of law on the subject of the validity of the sections in question is correct.

IV. The legislature had ample power to authorize the city to borrow money, issue bonds therefor, dispose of the bonds, invest the money raised thereupon in the stock of the Rochester and Genesee Valley Rail Road Company, and do all things provided for by such sections, according to the terms thereof. The prevailing opinion in this case in the Supreme Court, (24 Barb. 446,) and the cases there cited, it is submitted, are decisive of this position, both upon principle and authority. (See also *Grant* v. *Courter*, 24 Barb. 232; *Benson* v. *The Mayor &c. of Albany*, Id. 248.) But the point is conclusively settled by recent decisions of this court. (*Starin* v. *The Town of Genoa*, 23 N. Y. Rep, 439; *Gould* v. *Town of Sterling*, Id. 456; *The People* v. *Mead*, 24 id. 114; *Bank of Rome* v. *Village of Rome*, 19 id. 20, 23; 18 id. 38.)

V. The subscription for and taking by the city of the 3000 shares of stock was valid and binding, and the city thereby became lawfully entitled to the stock.

VI. The contract between the city and the plaintiff is in

conformity with the aforesaid sections, and valid. The objection that it provides for the sale of the stock otherwise than for cash, and for less than par, is not well founded. The sale is none the less for cash, because part of the price was to be paid in future. Until payment should be made, the sale would not be consummated—it would rest in the mean time merely in executory contract; but as payments should be made, the plaintiff would become entitled to transfers of the stock to the extent of the payments. The provisions of the contract make the sale of the bonds, taken together, a sale at par. The plaintiff was to pay the nominal amount of the stock, with interest at 6 per cent; the stock was not on interest, and it does not appear there was any dividend, or that 6 per cent was not equal to all the stock could reasonably be expected to yield. The bonds of the city already issued to pay towards the stock were at 6 per cent interest; their bonds to be issued were to be at the same rate of interest. The cost of the stock to the city was, therefore, to be only its nominal amount, and interest at 6 per cent.

VII. But if the contract is invalid, either because payments were to be made in future, or because the sale was for a price below the par value of the stock, that is not a sufficient basis for this action to recover back the sums paid by the plaintiff towards the stock, while the defendants are not in default in respect to a transfer of the stock, or performance on their part. Again; as payments were accepted by the city, the plaintiff became entitled to transfers of stock to the extent of the payments, according to the terms of the contract. Upon each payment, there was a sale to the extent of the payment. Until, therefore, the city refused to transfer stock as the plaintiff became entitled to a transfer, he could not maintain an action to recover back what he had paid. (6 Barn. & Cress. 651, 656; *Collier* v. *Coates,* 17 Barb. 471, and cases cited; *Paige* v. *Ott,* 5 Denio, 406; *Ketchum* v. *Evertson,* 13 John. 359; *Abbott* v. *Draper,* 4 Denio, 51; *Smith* v. *Brady,* 17 N. Y. Rep. 173.)

VIII. The sections in question are not void under article 3, § 16, of the constitution, which provides that no private or local bill which may be passed by the legislature, shall embrace more than one subject, and that shall be expressed in the title. (*The Sun Mutual Ins. Co.* v. *The Mayor, &c.,* 4 Seld. 241 ; *The People* v. *The Supervisors of Chenango,* Id. 328 ; *Brewster* v. *The City of Syracuse,* 19 N. Y. Rep. 116 ; *The People* v. *The Supervisors of Orange,* 17 id. 235.) The title is no more obnoxious to objection than a general title of an act of incorporation of a city or village, when the act contains, as is usual, separate provisions on several subjects, relating to the powers of the corporation.

IX. Those sections are not invalid by reason of the submission therein provided for to the electors of the city, and by declaring the sections should not "take effect," unless aproved by the electors. The sections are part of an act entitled, "An act to amend and consolidate the several acts relating to the city of Rochester," consisting of twenty-five sections, which act, it is declared by the last section thereof, "shall take effect immediately." The last section is numbered 293 — erroneously, as is supposed — but whether it applies to the whole act, or only to the matters of the last preceding amendment, is not material for the purposes of this case. It is sufficient for this case that the twenty-fourth amendment was to take effect immediately. Embraced within the act which was to take effect immediately, and in one of the sections in question, introduced by the last amendment, numbered 291, it is provided that sections 285 to 291, inclusive, "shall not take effect until they shall have been submitted to the electors of the city, *for the purpose of determining whether or not it is expedient for said city to borrow the money mentioned in the said section, for the purpose therein specified.*" It is further provided in that section for ballots having thereon "for the rail road," approving of said sections, and ballots having thereon, "against the rail road," disapproving of the sections. By section 292,

introduced by the last amendment, is provided that if the sections in question shall be approved by two thirds of the electors voting, then the same shall "take effect immediately after the filing of the certificates" of approval by the mayor and the clerk of the common council. As the entire act, or the entire matter of the last amendment, was to take effect immediately, the legislation was complete and perfect—the legislative power was fully exercised—but in the language of the court in *Starin* v. *The Town of Genoa*, (23 N. Y. Rep. 447,) "the parties to be affected by it were to be at liberty to accept the privileges granted in view of the burden and obligations it would impose, as their interest or will should dictate:" or, in other words, as stated in substance by the court in *The Bank of Rome* v. *The Village of Rome*, (18 N. Y. Rep. 38, 45,) " the legislature did not compel the city to act, but, creating by law the necessary machinery, left it to the electors of the city to determine the matter." The phraseology employed, that the sections in question *"shall not take effect"* until they shall have been submitted to the electors of the city, and approved by two thirds of them voting at the election, imports only that the powers conferred shall not be exercised, unless they shall be so approved; otherwise, it would be in conflict with the provision in one of those sections (291) for an election, and the submission of the sections for approval, and also with the last section, that "this act shall take effect immediately." That it was intended to be merely equivalent to a provision, that the powers conferred shall not be used, unless the sections shall be so approved, is further apparent from the fact that the sections purport only to give to the common council authority to do the acts therein specified, without imposing any obligation to exercise it. They are not to take effect, that is, the common council are not to have the power, or, which is the same thing, the authority is not to be exercised, but upon the condition prescribed. The sections in this respect are analogous to the act involved in *The Bank of Rome* v.

*The Village of Rome,* (18 N. Y. Rep. 38,) which, after conferring the authority to subscribe for and hold stock in a rail road corporation, and to execute bonds for the payment of the stock, provided that "the board of trustees shall have *no power* to make such subscription as is authorized in the first section of this act, nor to issue bonds or create any liability under *this act,* until *it* has been previously approved by two thirds" of certain electors. It was held by this court that the condition related to the exercise of the authority, and that the act was valid. See *Bank of Rome* v. *Village of Rome,* (19 N. Y. Rep. 20,) where this decision is approved. The decisions of the court in *Starin* v. *The Town of Genoa,* (23 N. Y. Rep. 239,) and *Gould* v. *The Town of Sterling,* (Id. 456,) involve similar acts, and are of a like character. These views as to the interpretation of the words, "shall not take effect," are strongly confirmed by the statement in section 291 of the sections in question, of the purpose of the election provided for, viz. "determining whether or not it is *expedient for said city* to borrow the money mentioned in said section for the purposes therein specified." The expediency of exercising the power, whether the electors choose to exercise it, through the instrumentality provided, alone is left to the decision of the electors. The legislative judgment as to the expediency of giving the power, and the legislative will that the city have the power, are perfectly expressed, with the single restriction as to its exercise, that the city shall, in the prescribed manner, manifest its desire to use it. The case is, therefore, directly within the principle of the cases above referred to, and is distinguished from *Barto* v. *Himrod,* (4 Seld. 483,) in like manner as those cases.

X. The contract was entered into with a full knowledge by the plaintiff of all the facts; the payments by him upon it were voluntarily made; he has received and retains benefits under it, and is not entitled to recover back what he has paid.

DENIO, Ch. J. Since this action was commenced, and since the judgment appealed from was rendered, some of the questions which were discussed by the learned judges of the Supreme Court have been decided in other cases in this court. The money which was to be raised by the city of Rochester was, by the statutory provisions which are drawn in question, to be applied in promoting the construction of a rail road terminating in that city, by means of the purchase of shares of stock in the rail road corporation. And it was considered by some of the judges that this was a power which, from its nature and on account of certain constitutional provisions, could not be exercised by a municipal corporation, even with the sanction of the legislature. But it has been determined otherwise by this court in some cases to which reference will presently be made, and the point is, consequently, no longer insisted on by the counsel for the plaintiff.

The only questions which are now open for discussion, and the only ones which have been urged on behalf of the plaintiff, are raised by these two propositions : first, that the sections of the act amending the charter of the city of Rochester, (§§ 285 to 292 inclusive, of ch. 389 of the Laws of 1851,) were not constitutionally passed by the legislature, and hence were never a part of the law of this state; and secondly, if this were otherwise, that the contract between the parties to this suit under which the plaintiff advanced the money which is sought to be recovered in this action, was void, because the common council of the city exceeded the authority which these sections conferred, in entering into that contract. If either of these positions can be maintained, it is further contended that the money advanced by the plaintiff to the defendant can not be retained by the latter, but is to be considered as money received by the city for the plaintiff's use.

(1.) The general purpose of the sections referred to was to enable the city corporation, upon certain conditions, to subscribe for and become the purchaser of stock in the Rochester and Genesee Valley Rail Road Company, an existing

corporation whose road was to terminate in the city, to the amount of three hundred thousand dollars; to issue the corporate bonds for that amount of money; and to dispose of the stock by sale; and to raise by taxation the money to discharge the interest of these bonds. The provisions are challenged as not being an emanation of the law-making power which the constitution has committed to the legislature; but it is argued that, on the other hand, they derive whatever authority they possess, as statutory enactments, from the vote of the electors of the city of Rochester. The six sections which precede section 291 contain detailed provisions authorizing the common council of the city to subscribe for the stock and to issue their bonds. They are in the ordinary form of an enabling statute, enacted by the legislature by its proper authority, and then the section 291 declares that these preceding sections *shall not take effect* until they shall have been submitted to the electors at a special election. Detailed arrangements respecting the election were then made, the purpose being stated to be that of determining "whether or not it is expedient for said city to borrow the money mentioned in said section, for the purposes therein specified." Prior to the election, the sections in question are to be published in two daily papers. The form of the ballots are to be "*For the rail road*," and "*Against the rail road*." And it is declared that the former "shall be deemed to approve of said section," and the latter "shall be deemed as not approving it." Provision is then made for canvassing the votes, and the mayor and clerk are to make a certificate that the sections are approved, or are not approved, as the case may be, by two thirds of the electors voting. The next section, (292,) declares if the section shall be approved by the requisite majority, "that the same shall take effect immediately after the filing of the certificate of such approval of the said act." The final section declares that "this act shall take effect immediately."

The general question involved in the present appeal has

been passed upon by this court on several occasions.     (*Barto v. Himrod,* 4 Seld. 483; *The Bank of Rome* v. *The Village of Rome,* 18 N. Y. Rep. 37; S. C. 19 id. 20; *Starin* v. *The Town of Genoa,* 23' id. 239; *Gould* v. *The Town of Sterling,* Id. 456.)     The principles settled in these cases are, first, that the legislature can not commit the power of enacting laws to any other body than itself, not even to all the electors of the state; and that this principle can not be evaded by a statute which shall prescribe the details of a particular legislative act, and then provides that the question whether it shall be established as law shall be determined by a vote of the electors.     This was the plan resorted to in respect to the free school act which was in question in *Barto* v. *Himrod.*     It was said, with entire accuracy, as I conceive, that what was done by the legislature in that case was to propose to the people the details of a statute, and then to put it to the electors to determine whether they would or would not clothe it with the attributes of law.     If it met their approval it was to become a statute of the state; otherwise it was to be entirely void.     The statute which was thus proposed, and which was approved of by the voice of the electors, was one of the most general character, affecting the whole state, and the deliberate judgment of this court was that such statutory provisions could not be brought into existence in that manner.     The government organized by the constitution was considered to be, as it undoubtedly is, that of a representative republic, and no power existed in the legislature to convert it, on any occasion, or for any purpose, into a pure democracy.     The organization of the law making power is one of the principal purposes of a constitutional charter of government, and, in all communities of considerable extent, this must be effected by means of a system of representation, by which the people at stated periods delegate to citizens chosen by them the power of enacting general laws, by which all the members of the state are to be governed.     That purpose is expressed in the constitution of this state by the declaration

that the legislative power shall be vested in the senate and assembly. (Art. 3.) But all general reasoning is rendered unnecessary by the explicit determination in the case of *Barto* v. *Himrod.* But while general statutes must be enacted by the legislature, it is plain the power to make local regulations, having the force of law in limited localities, may be committed to other bodies representing the people in their local divisions, or to the people of those districts themselves. Our whole system of local government in cities, villages, counties and towns, depends upon that distinction. The practice has existed from the foundation of the state, and has always been considered a prominent feature in the American system of government. It is recognized in the constitution itself, in the section which prescribes to the legislature the duty to provide for the organization of cities and incorporated villages, &c., restricting their power of taxation and borrowing. It contains an irresistible implication that the authority to lay local taxes and to borrow money for local objects, may be constitutionally committed to local boards or councils within the cities and villages. And if such power may be conferred to be exercised according to the judgment of such boards or councils, and without the condition that the electors shall concur in the measure, it is plain that it may be granted upon that condition, or with any other reasonable safeguards which may be prescribed. I do not say that it can be submitted to the electors of a city or village to determine what powers its local legislature shall possess, but only that these bodies may be made the depositories of such powers of local government as the legislature may see fit to prescribe, and the exercise of which is not repugnant to any of the general arrangements of the constitution. This position has also been settled by this court. In *The Bank of Rome* v. *The Village of Rome,* above referred to, the question arose upon a statute very similar, in its main features, to the one we are now considering. Power was given to the board of trustees to subscribe for stock in a rail road to be organized, and which

should terminate in the village of Rome, and to issue the
bonds of the corporation for the purpose of raising the neces-
sary moneys.   But it was provided that the trustees should
not have the power to make the subscription or issue the
bonds or create any liability under the act, until the scheme
had been previously approved by two-thirds of all the electors
whose names were on the assessment roll for the last pre-
ceding year, and who had paid taxes.   The action was upon
one of these bonds, and it was held that it was a legal obli-
gation, and the plaintiff recovered.   The court considered that
the power was conferred by a perfected act of the legislature,
which act did not require, in order to become a law, the assent
of any person, and that the vote of the tax payers, which was
prescribed, was simply a condition which the law making
power thought proper to annex to the exercise of the authority
conferred upon the trustees.   It was held not to be at all
within the principle of the case of *Barto* v. *Himrod*, which
was a general act, of universal application to the whole state,
and was to have no operation until approved by the electors
of the state.   (18 N. Y. Rep. 38.)   The same doctrine was
directly held, or tacitly acted upon as a settled doctrine, in the
other cases to which I have referred.   The precise question
in the present case is, therefore, whether the sections of the
act to amend the charter of the city of Rochester which are
under examination, are to be considered as not having been
enacted by the legislature, and hence not to be any part of a
public law, or a law of any kind, until passed upon by the
electors of Rochester; and as thus being of the same charac-
ter with the free school law; or whether these sections did,
of their own proper force, and before the taking of the vote
of the electors, and, whether any such vote were taken or not,
become public law as distinguished from corporate legislation,
and thus to assimilate the case to that respecting the village
of Rome just mentioned.   As I have remarked, the general
purpose of both acts was precisely the same.   The intent
was to enable the corporate authorities of the two municipal-

ities to embark in the respective rail road enterprises, to raise the requisite funds by borrowing on corporate bonds, and finally to pay the money borrowed by local taxation; and it is only on account of the peculiar language made use of in the provisions respecting the city of Rochester, in the sections in question, that a distinction between the two cases has been attempted. That language has been already referred to. The declaration that these sections *shall not take effect* until submitted to the electors, and that they *shall take effect immediately* after their approval shall be certified, do certainly tend to the conclusion that the legislature did not suppose that they were creating a binding public law, but rather that they were proposing such a law, to the electors, to be established or disallowed by them at their pleasure. But then the last section is equally emphatic the other way. It is distinctly declared that the whole act, of which these sections are a part, shall take effect immediately. It follows, from the general view which I have taken of the power of the legislature to confer a more absolute power of local legislation, that if the 291st section, instead of employing the words used respecting the taking effect of these sections, had provided that it should be a condition to the exercise of the power conferred, that the scheme should be first submitted to the electors in the precise form in which it was submitted, and that it might be exercised, if the electors should approve of the plan, and not otherwise, the case would have been perfectly plain, and the judgment we gave respecting the Rome bonds would have been a precise precedent in favor of the plaintiff. The act would have been no more obnoxious to the charge that the legislature had abdicated its authority in favor of the voters of Rochester, than would any of the numerous acts conferring taxing and borrowing powers on cities, villages, towns and counties, where the question of the exercise of the power is to be contingent upon the volition of the electors, or of local boards or councils. The whole of the language of these sections, it should be observed, is not

of a character to denote that the existence of the law was to depend upon the vote.    The form in which the will of the voters was to be expressed looks rather to the expediency of the enterprise than to the establishment of the sections as law.    The ballots were to be *for the rail road,* and *against the rail road.*    These words, though not precisely expressive of what was designed, were plainly intended to indicate the mind of the voters as in favor of or against the scheme of embarking the city in the improvement, in the manner set forth in the sections.    I am of the opinion that we ought rather to regard the substance and intention of these sections than their peculiar phraseology.    If it can not be denied— and I am sure that it can not—that the legislature could confer the authority in question upon the common council on condition that it should be submitted to and should meet the approbation of the electors, we should not be astute to find in the verbiage made use of, an intention to do an illegal and unconstitutional act.    If upon one construction of that language the constitution would be violated, while on the other construction the transaction would be wholly without objection, and the substantial object intended to be effected, according to either interpretation, would be the same, every principle of constitutional interpretation would admonish us to adopt the legal rather than the unconstitutional meaning. The mandate of the last section is certainly repugnant to the same words used in one of the preceding ones.    If we are to settle which shall prevail, we should hold to those which shall accomplish the object intended, it being a perfectly legal one, rather than those which shall prostitute that intention, *ut res magis valeat quam pereat.*    Hence I am in favor of deciding that the law was enacted by the legislature, and not by the people of Rochester, and that the subscription for the stock and the making of the bonds were valid acts.

(2.)  The other question is whether the contract between the parties contains provisions not warranted by the statute, considering it to be a valid law.    The provisions of the act

necessary to be considered in resolving this question, are these: The common council were authorized to exchange the stock, in whole or in part, for the bonds, and in the event of such exchange they were to cancel the latter; they were authorized to dispose of the stock to any one who would purchase it *for cash;* but they might not sell it for less than par, except at public sale, of which notice by advertisement was to be given, and if it should be sold, the proceeds were to be strictly applied to the redemption of the bonds. As to the bonds, the directions were that the $300,000 might be borrowed for a term not exceeding twenty years, at a rate of interest not exceeding seven per cent per annum, and corporate bonds might be given therefor; and it was enacted that the common council might 'dispose of such bonds to such persons or corporations as they shall deem most advantageous to the city, *but not for less than par.*' Prior to the entering into the contract between the city and the plaintiff, the former had executed bonds to the amount of $100,000, and had disposed of the same for a premium amounting in the aggregate to $4655. The contract was dated March 2, 1853. It recites that the city had subscribed for and obtained the $300,000 worth of stock, for which it was to pay that amount, or such part of it as the rail road company should require. By its terms the city sells, and the plaintiff purchases, the whole of the stock at $300,000, payable $20,000 down, and $2000 on the 1st day of January in each year thereafter for twenty years, and the whole residue on the 1st day of January, 1873, with interest on the part at any time unpaid at six per cent, payable semi-annually. This interest was to be received on $100,000 from January 1, 1853, that being the date of the $100,000 of stock sold, and on the residue from the time the city should be required to pay the money to the rail road company as its subscription for stock. The city was to issue to the plaintiff or his appointee corporate bonds to the amount of $180,000, for which he was to pay them the par amount in money as they should be issued. The

plaintiff was to have paid to him the premium realized on
the $100,000 of stock which had been sold "so that the sale,"
as the contract reads, "of the whole amount of bonds shall
be, when taken together, a sale at par." The city was to retain
the title to the stock and the scrip issued for it, and to
have all the rights of stockholders, but the plaintiff was to
have all dividends made by the rail road company. The
plaintiff was entitled to anticipate his payments upon sur-
rendering an equal amount of bonds, and might then call for
a transfer of a proportionate amount of stock. A failure by
the plaintiff to perform in any respect was, at the election
of the city, to involve a forfeiture of the contract and all pay-
ments made by him. The bonds issued were, and those to
be issued were to be, on interest at the rate of six per cent
per annum. It is urged in the first place, by the plaintiff's
counsel, that the sale of the stock was on credit and not for
cash as required by the statute ; but I think the position is
satisfactorily answered by the suggestion that the stock was
not to be parted with until the money was paid. Nothing
depended upon the personal responsibility of the purchaser.
The sale was in one sense conditional and executory, but
when executed in such manner as to divest the city of the
title to the stock, it was to be paid for in cash. There is
nothing in the act forbidding such a transaction. The inhi-
bition to sell otherwise than for cash was inserted to guard
against a sale upon the credit of any person, or upon any
security other than the stock itself. As long as the city re-
tained the stock until the money should be paid, it can not be
said that they sold it on credit, or otherwise than for cash.
It is then insisted that the stock and the bonds, one or both
of them, were sold at less than par, which was forbidden,
except as to the stock which might be sold at a discount if it
should be subjected to a public sale. But the sale was not
a public one. The violation of these provisions is inferred
from the undertaking of the city to allow the premium which
it had realized on the first sale. As to the bonds, they might

have been made to bear an interest of seven per cent consistently with the act, but those sold, as well as those which were to be issued, carried but six per cent interest. In my opinion the intention of the legislature was simply to limit the interest to be paid by the city to seven per cent. This will not be exceeded or equaled by the amount actually made. Considered simply as a sale of the $180,000 of bonds, the payment of the $4655 would not bring the interest upon the money to be paid by the plaintiff up to seven per cent per annum, if the bonds should be made to run until the closing up of the affair in 1873, and the city had the right to determine what time of payment should be inserted in them. The difference between the seven per cent and six per cent on the $180,000 would absorb the premium in less than three years. Supposing the prohibition to be against selling the bonds at less than par, at whatever rate of interest they might be issued, it is yet doubtful whether, if, taking the sale of all the bonds together, the rate would not be exceeded, (and such would not be the case taking the whole $280,000 into the account,) the statute would be violated. Without, however, placing any considerable reliance upon this last view, I am of opinion, upon the whole, that the spirit and effect of the act was not violated.

No objection can be made to the price at which the stock was contracted to be sold. The plaintiff was to pay par and interest for it, and although it was connected with the agreement to sell the bonds, the paying over to the plaintiff of the realized premium should not be attributed to the depreciation of the stock, for it was, in terms, made a part of the transaction respecting the bonds, and the circumstances do not afford any occasion for transferring that feature of the contract to the sale of the stock, if, as I have supposed, it was a legitimate portion of the bargain respecting the bonds.

I am in favor of affirming the judgment of the Supreme Court.

HOGEBOOM, J. read an opinion in favor of affirmance, and DAVIES, WRIGHT and MULLIN, JJ. concurred.

JOHNSON, J. dissented. INGRAHAM, J. thought the statute, and the contract entered into in pursuance of it, void.

SELDEN, J. took no part in the decision.

Judgment affirmed.