[Crim. No. 1328.   In Bank.—October 13, 1906.]

## In Re ANDREW PFAHLER, on Habeas Corpus.

MUNICIPAL CORPORATIONS — FREEHOLDERS' CHARTER — INITIATIVE AND REFERENDUM — CONSTITUTIONAL LAW — REPUBLICAN FORM OF GOVERNMENT.—A freeholders' charter of a municipal corporation framed and adopted under the provisions of section 8 of article XI of the constitution, and approved by the legislature, may incorporate the procedure known as the "initiative and referendum," so as to authorize the majority of the electors at the ballot-box to participate directly in the enactment of local laws; and such procedure is not in violation of any provision of the state constitution, nor of the provision of section 4 of article IV of the constitution of the United States, providing that "The United States shall guarantee to every state in this Union a republican form of government." That section does not prohibit the direct exercise of legislative power by the people of a subdivision of the state in strictly local affairs.

ID.—PRACTICAL CONSTRUCTION OF FEDERAL PROVISION.—The provision of the federal constitution guaranteeing a republican government to each state in the Union was manifestly intended to apply only to the state as a whole. It was framed and adopted with full knowledge that a system of local government in town meetings obtained in some of the states; and that system was continued

under the constitution, without any question as to its validity, and it is still found not only in several of the New England states, but also in other states. There are besides numerous other instances of the direct exercise of legislative power by the people in local affairs, authorized by the state.

ID.—QUESTION OF STATE POLICY.—It is a question of local policy with each state to determine what its political subdivisions shall be, and what shall be the extent and character of their powers, and the manner of their exercise, and to what extent the people of a municipality shall be allowed to participate directly in the governmental function of legislation therefor. In the determination of those questions the entire body politic known as the state has absolute power, and the courts have nothing to do with that question of policy.

ID.—GRANT OF LOCAL POLICE POWER BY CONSTITUTION—MODE OF EXERCISE.—Section 11 of article XI of the constitution of this state, providing that "Any county, city, town, or township may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws," while it grants a local police power, grants it to the body politic and not to the city council as such, and does not determine the mode of the exercise of such power. The matter is left to the determination of the city or town, in accordance with the provisions of its charter.

ID.—DELEGATION OF LEGISLATIVE POWER TO MUNICIPALITIES.—As to such local legislation as may not be included in the constitutional grant, the creation of municipalities, with power to exercise local self-government is not a forbidden delegation of legislative power, it being within the constitutional power of the legislature to provide for municipal corporations, and the approval by the legislature of a freeholders' charter delegating legislative power to the city is expressly authorized by the constitution.

ID.—EXPENSE OF ELECTION—INDEBTEDNESS OF CITY—PRESUMPTION.— The objection that the expense of an election may prevent the proper exercise of the police power, by making the city indebtedness thereby incurred in excess of the provision of section 18 of article XI of the state constitution, is not tenable. It must be presumed that the municipality will provide the funds necessary for the administration of its government.

ID.—DELEGATION OF POWER TO SPECIAL COMMISSION.—The initiative and referendum by the people is not within the provision of section 13 of article XI of the constitution prohibiting the delegation of power to "a special commission" to perform any "municipal functions." The aggregate body of qualified electors cannot, under our constitution, be held to be "a special commission" within the meaning of that provision.

ID.—FREEHOLDERS' CHARTER NOT AFFECTED BY MUNICIPAL CORPORATION ACT.—The fact that the initiative and referendum conferred in a

freeholders' charter is not conferred in the General Municipal Cor-
poration Act does not affect its validity. As to municipal affairs,
it is sufficient that a charter is consistent with the constitution.
The provision of the constitution for a freeholders' charter is
distinct from the grant of power under the Municipal Corporation
Act, and cannot be affected by its provisions.

USE OF WORDS "LEGISLATIVE AUTHORITY."—The use of the words
"legislative authority" in section 8 of article XI as to proposed
amendments to freeholders' charters, was not intended to define
the powers of that body or place it in a position where it would
be beyond restrictions by the organic law of the city.

ID.—TITLE OF ACT APPROVING AMENDMENTS TO FREEHOLDERS' CHARTER.
—Where an initiative amendment was one of thirteen proposed
amendments to the charter of the city ratified by its electors, the
approval of the amendments as a whole by a resolution the title
of which stated it was a resolution "approving thirteen certain
amendments to the charter of Los Angeles," etc., was not in
violation of the requirement that every act shall embrace but one
subject which shall be expressed in its title. The method pursued
was strictly in accord with the provision of section 8 of article XI
of the constitution.

APPLICATION for Writ of Habeas Corpus to the Chief
of Police of the City of Los Angeles.

The facts are stated in the opinion of the court.

Robert A. Todd, for Petitioner.

C. W. Pendleton, E. S. Torrance, Earl Rogers, and Luther
G. Brown, *Amici Curiæ*, also for Petitioner.

William B. Mathews, Herbert J. Goudge, and Hunsaker
& Britt, for Respondent.

W. H. Davis, Wright & Wright, Allen G. Wright, William
J. Danforth, W. G. Burke, City and County Attorney for
San Francisco, and W. D. Burchard, Assistant, *Amici Curiæ*,
also for Respondent.

ANGELLOTTI, J.—The petitioner is held in the custody
of the chief of police of the city of Los Angeles, under a
warrant issued upon a complaint charging him with a viola-
tion of the provisions of a certain purported ordinance of
said city, which ordinance prohibits, except within certain

defined limits, the killing or slaughtering of animals the flesh of which is to be sold or offered for sale or eaten. There is no claim that the complaint does not state facts sufficient to show a public offense under the provisions of said ordinance, nor is there on the part of the petitioner any claim that the ordinance, if legally enacted, was not a reasonable and valid exercise of the police power vested in such city. Petitioner's claim is that the purported ordinance has never been legally enacted.

The ordinance was not adopted in the ordinary way, by vote of the city council and approval of the mayor, but by the electors of the city at a general election, at which it was submitted for their approval or rejection, such submission having been compelled by a petition submitted to the council signed by electors equal in number to at least five per cent of the vote cast for all candidates for mayor at the last preceding election. The procedure was in strict accord with what is known as the "initiative" provision of the charter of Los Angeles, which, together with what is known as the "referendum," was made a part of such charter by amendments ratified by the people of such city at an election held December 1, 1902, and approved by the legislature of the state on January 30, 1903. (See Stats. 1903, pp. 555, 572.) The real question presented by this proceeding is, then, as to the validity of this provision of the charter.

The city of Los Angeles is a municipal corporation operating under a freeholders' charter, framed and adopted under the provisions of section 8 of article XI of the constitution, and approved by the legislature January 31, 1889, (Stats. 1889, p. 445). By that charter the legislative power of the city was vested in a council provided for by such charter, subject to the power of veto and approval by the mayor. The initiative amendment of 1902 and 1903, so far as material to the question here presented, provides substantially as follows: Any proposed ordinance may be submitted to the council by a petition signed by registered electors of the city. If such petition is signed by electors equal in number to fifteen per cent of the entire vote cast for all candidates for mayor at the last preceding general election at which a mayor was elected, and contains a request that said ordi-

nance be submitted forthwith to a vote of the people at a special election, the council must either,—1. Pass such ordinance without alteration (subject to a referendary vote as elsewhere provided), and if, when passed, it is vetoed by the mayor, and on reconsideration fails of passage by the council, submit it to a vote of the people at a special election; or 2. Call a special election, at which said ordinance, without alteration, shall be submitted to a vote of the people. If the petition is signed by electors equal in number to at least five per cent, but less than fifteen per cent of such vote, the ordinance shall be submitted to a vote of the people at the next general municipal election that shall occur at any time after thirty days from the date when the sufficiency of the petition is officially determined. "If a majority of the qualified electors voting on said proposed ordinance shall vote in favor thereof, such ordinance shall thereupon become a valid and binding ordinance of the city; and any ordinance proposed by petition or which shall be adopted by a vote of the people cannot be repealed or amended, except by a vote of the people. . . . The council may submit a proposition for the repeal of any such ordinance, or for amendments thereto, to be voted upon at any succeeding general election; and should such proposition receive a majority of the votes cast thereon at such election, such ordinance shall be repealed or amended, accordingly.''

The accompanying referendum amendment provides: ''No ordinance passed by the city council (except when otherwise required by the general laws of the state or the provisions of the charter, respecting street improvements, and except an ordinance for the immediate preservation of the public peace, health or safety, which contains a statement of its urgency, and is passed by a two-thirds vote of the council, but no grant of any franchise shall be construed to be an urgency measure, but all franchises shall be subject to the referendary vote herein provided for), shall go into effect before thirty days from the time of its final passage and its approval by the mayor.'' It is further provided therein that a protest against such ordinance filed during said thirty days, signed by electors equal in number to at least seven per cent of such vote, shall have the effect of suspending the ordinance from going into operation and require the council

to reconsider the same, and, if that body does not entirely repeal it, submit it to the electors at a general or special election, the ordinance to go into effect or not as the majority of the electors voting thereon shall decide.

While no question as to the validity of the referendum amendment is directly involved here, we have briefly set forth its provisions, as the two amendments are simply part of one general plan or scheme looking to a more direct control of local legislation by the people of the city, and, so far as the principal objections here made are concerned, must stand or fall together. Those objections go to the question of the validity, under the provisions of the constitution of the United States and our own constitution and laws, of any provision in a municipal charter which authorizes the electors of the municipality to participate directly in the enacting of local laws. These two amendments, the initiative and the referendum, have the same effect in this respect. In each, it is the vote of the electors at the ballot-box that finally determines whether or not a proposed measure shall be a law at all, and it can make no difference in principle whether the proposition originates with electors or with the council. In each, the electors by their vote at the ballot-box directly exercise legislative power. By these amendments the electors are, except in certain specified cases, given an effectual veto power as to all ordinances approved by the council, and are clothed with authority paramount to that of the council to directly enact such local legislation as they may deem expedient, where the council declines to enact the same.

The charter provision relative to the initiative, which is substantially similar to recently enacted provisions in the charters of other municipalities of the state, is vigorously attacked by counsel for petitioner and other attorneys appearing as *amici curiæ*, who claim to see in this curbing of the power of the ordinary legislative body of the city, this vesting in the electors of a municipality the power to enact measures which the legislative body refuses to approve, a violation of our own constitution, and a forbidden departure from the republican form of government guaranteed by the constitution of the United States.

The latter objection may appropriately be first considered. Its sole foundation is section 4 of article IV of the constitution of the United States, which is as follows: ''The United States shall guarantee to every state in this Union a republican form of government, and shall protect each of them against invasion; and on application of the legislature, or of the executive (when the legislature cannot be convened), against domestic violence.'' The contention here is, necessarily, that any attempt by a state to provide for a direct exercise of legislative power by the people, instead of by representatives of the people elected or appointed for that purpose, is, even in purely local affairs, inconsistent with the republican form of government guaranteed by this provision, and ineffectual for any purpose, the theory being that such provision requires a purely representative form of government not only in the state itself, but also in all its subdivisions, leaving no vestige of power of direct legislation in the people themselves.

If we assume that this claim presents a judicial question rather than a political one to be determined by the Congress of the United States (see, however, *Luther* v. *Borden,* 7 How. 1; *Taylor* v. *Beckham,* 178 U. S. 548, [20 Sup. Ct. 1009]), we are brought to a consideration of the question as to what was meant by this guarantee of a republican form of government. For all the purposes of this proceeding, it is sufficient to hold, as we do, that it does not prohibit the direct exercise of legislative power by the people of a subdivision of a state in strictly local affairs. In saying this, we do not wish to be understood as intimating that the people of a state may not reserve the supervisory control as to general state legislation afforded by the initiative and referendum, without violating this provision of the federal constitution. That they may do so has been decided by the supreme court of Oregon in the case of *Kadderly* v. *Portland,* 44 Or. 118, [74 Pac. 710, 75 Pac. 222], which appears to be the only case in which that question has been directly presented. (See, also, *Hopkins* v. *City of Duluth,* 81 Minn. 189, [83 N. W. 536].) However this may be, it is clear that the direct participation of the electors of subdivisions of a state in legislation as to local affairs was never intended to be prohibited by the framers of the federal constitution, or the

states adopting the same, and that such power has been exercised by them, where not inconsistent with provisions of their state constitution, in innumerable instances, from the institution of our government to the present day, without interference of any kind on the part of the federal government.

As is universally recognized by courts and writers on constitutional law, it must be assumed that there was nothing in any of the forms of government prevailing in the various states at the time of the adoption of the constitution that was violative of the provisions under discussion. Discussing this question, and speaking of the forms of government then existing in the various states, the supreme court of the United States said, in *Minor* v. *Happersett,* 21 Wall. 162, 175, 176; "These governments the constitution did not change. They were accepted precisely as they were, and it is, therefore, to be presumed that they were such as it was the duty of the states to provide. Thus we have unmistakable evidence of what was republican in form within the meaning of that term as employed in the constitution." It is unnecessary to here do more than to refer to the widely known and well-recognized form of local government that prevailed in several of the states at the time of the adoption of the constitution, known as the New England town government, under which all the inhabitants in town meeting directly exercised such legislative power as was essential to the conduct of local affairs. No difference material to the objection under discussion is to be found in the fact that they did this in public meeting, rather than by secret ballot at the polls, as under the provision before us. The objection here made is that, under the republican form of goverment guaranteed by the federal constitution, such power cannot be directly exercised by the people, and, so far as that objection is concerned, if the people may legislate directly in town meeting, they may do so by their votes at the polls. The constitutional provision was framed and adopted with full knowledge of this system of local government that then obtained in four of the states, and that system was continued under the constitution, without any question as to its validity. It is still to be found not only in several of the New England states, but also in other states (see 1 Bryce's American Commonwealth, pp. 594, 601, 605; 1 Dillon on Municipal Corpora-

tions, sec. 258), and we are not aware that any suggestion has ever been made that this form of local government is prohibited by the federal constitution. Other instances practically without number of the direct exercise of legislative power by the people in local affairs authorized by the state might be noted. As suggested in the briefs, the forms of local government in this country have been most varied, running all the way from the pure democracy of the town-meeting form of government up to such absolute control by the legislature of the state as deprived communities of any voice in their local affairs. It is apparent from this condition of affairs, existing continuously from the moment of the adoption of the constitution, that, if there is anything therein inconsistent' with a republican form of government, within the meaning of these words as used in the federal constitution, the constitutional guarantee was intended to apply only to the form of government for the state at large, and not at all to the local government prescribed by the state for its municipalities and other subdivisions.

Whatever may be said as to the former, the latter is undoubtedly true. It is clearly a question of local policy with each state what shall be its various political subdivisions for purposes of internal government, and what shall be the extent and character of the powers of those subdivisions and the manner of their exercise. The power of a state in such matters is absolute. (See *Claiborne* v. *Brooks,* 111 U. S. 400, [4 Sup. Ct. 489]; *Forsyth* v. *Hammond,* 166 U. S. 506, [17 Sup. Ct. 665].) Where the authority of the electors of a municipality or other subdivision of a state to directly legislate in a matter of purely local concern is denied by a state court, it is denied solely upon the ground that the state constitution or statutes forbid the exercise of such power, as in *Elliott* v. *Detroit,* 121 Mich. 611, [84 N. W. 820], and many cases cited by petitioner. (See Cooley on Constitutional Limitations, 7th ed. pp. 165, 166; Dillon on Municipal Corporations, sec. 44 and note.) The extent to which the people of a municipality shall be allowed to directly participate in the governmental function of legislating therefor in local or municipal affairs is therefore purely a question of state policy, in the determination of which the state is not restricted by any provision of the federal constitution.

In thus speaking of the state, we mean not the legislature of the state, or the executive, or the judiciary, but the entire body of the people, who together form the body politic, known as the "state." (*Panhallow* v. *Doane's Admr.,* 3 Dall. 93, [Fed. Cas. No. 10,925]; *Brown* v. *State,* 5 Colo. 499.)

Coming to a consideration of the contention that the initiative amendment is in violation of the constitution and laws of this state: There is, of course, no doubt as to the possession by the municipality of Los Angeles of legislative power. By section 11 of article XI of the constitution, providing that "Any county, city, town, or township may make and enforce within its limits all such local, police, sanitary and other regulations as are not in conflict with general laws," the people of the state "have made a direct constitutional grant of the police power of the state to every municipal corporation for local purposes." (*Denninger* v. *Recorder's Court,* 145 Cal. 629, 631, [79 Pac. 360]; *Ex parte Lacey,* 108 Cal. 326, 328, [49 Am. St. Rep. 93, 41 Pac. 411]; *Ex parte Roach,* 104 Cal. 272, 276, [37 Pac. 1044].) As to such local legislation as may not be included in this constitutional grant, if it be assumed that the legislative power of the municipality operating under a freeholders' charter finds its source in any grant from the legislature, there is in this no forbidden delegation of the lawmaking power vested in the legislature. As said in *Stoutenburgh* v. *Hennick,* 129 U. S. 141, [9 Sup. Ct. 256], "While the rule is fundamental that the power to make laws cannot be delegated, the creation of municipalities exercising local self-government has never been held to trench upon that rule. Such legislation is not regarded as a transfer of general legislative power, but rather as the grant of the authority to prescribe local regulations, according to immemorial practice, subject of course to the interposition of the superior in cases of necessity." While the power so granted by a legislature may be called a delegated power, "the right to so delegate all powers of a municipal nature is expressly given to the legislature when, by the constitution, it is authorized and directed to provide for municipal corporations." (*Hellman* v. *Shoulters,* 114 Cal. 136, 149, [44 Pac. 915, 45 Pac. 1057].) So that if we assume for the purposes of argument that the legislature, in approving by concurrent resolution a charter framed by any

city containing more than three thousand five hundred inhabitants under section 8 of article XI of the constitution, delegates to the city any local legislative power, it is a delegation of legislative power that is expressly authorized by the constitution.

We do not understand that there is any claim that the city of Los Angeles—and by the term "city" we mean the municipal corporation, and not any officer or officers thereof—is not vested with legislative power, both under the constitutional provision quoted above and the freeholders' charter framed by the constitution and approved by the legislature, except in so far as it is urged that the word "city" in such constitutional grant to "any county, city, town," etc., must be construed as meaning some board or officers of the city, Manifestly, there is nothing in this claim. The grant to the "city" is a grant to the municipal corporation itself (*Denninger* v. *Recorder's Court*, 145 Cal. 629, 631, [79 Pac. 360]), the artificial body created by the laws made up of the people of the territory comprising the same organized as a body politic, and there is no authority that would warrant a different construction. The common council or other local legislative body and other charter officers do not constitute the "city," but are merely agents or officers of the city. (1 Dillon on Municipal Corporations, 3d ed., secs. 21, 40.) Legislative power has been properly granted or delegated by the state to the city. We are not here concerned, then, with the doctrine asserted by counsel for petitioner to the effect that the power to make laws conferred by the constitution on the legislature cannot be delegated by the legislature. The question here is simply whether it is competent, under our constitution and laws, to vest in the electors of a city, by the charter thereof, such right to directly participate in the exercise of the legislative power granted by the state to the city as is given them by the initiative amendment of the Los Angeles charter.

It will not be questioned that the charter of the city, whether it be the special act of incorporation authorized by our old constitution, the General Municipal Corporation Act enacted under our existing constitution, or the freeholders' charter, is the appropriate place in which to provide where the legislative power of the city shall be vested, and the

CL Cal.—6

manner of its exercise. One of the most important and essential offices of the charter is, and always has been, appropriate provision in this behalf. (See 1 Dillon on Municipal Corporations, sec. 39.) Our constitution declares that when a freeholders' charter is finally approved by the legislature it "shall become the organic law of the city" (sec. 8, art. XI), and such a charter has elsewhere been aptly termed the local constitution of the city. As such, provisions as to the distribution of the governmental functions, and the manner of their exercise, obtain, so far as the same are consistent with the constitution of the state. It has already been held by this court that the manner of enacting municipal ordinances and resolutions is unquestionably a municipal affair (*Morton v. Broderick*, 118 Cal. 474, 487, [50 Pac. 644]), and, therefore, under section 6 of article XI of the constitution, as amended in 1896, the provisions of a city charter in regard thereto are paramount to general laws of the state. When by section 8 of article XI of the constitution, every city containing more than three thousand five hundred inhabitants is authorized to frame "a charter for its own government," which, when ratified by the electors and approved by the legislature by concurrent resolution, "shall become the organic law" of the city, the city is authorized to make, subject to the approval of the legislature, such provision as it deems best for the exercise of the legislative power confided to it by the state, the only limitation being that the provision made must not be a violation of our state constitution. The provision so made may of course be changed by amendments to the charter, framed, ratified, and approved in the manner provided for the adoption of the original charter. (Const., art. XI, sec. 8.)

Wherein does the method prescribed by the initiative amendment violate any provision of our constitution?

The specific constitutional provisions pointed out by petitioner as violated by this amendment are two,—namely, sections 11 and 13 of article XI.

Section 11 of article XI of the constitution has already been quoted. It is the section granting the police power of the state to any municipal corporation of the state for local purposes. One of petitioner's points appears to be that this is a direct grant to the council or other legislative body of

the city or town, and that the direct exercise of legislative power by the people is inconsistent therewith. As already stated, the grant is to the municipality itself, the people in their organized condition as a body politic, and neither this nor any other provision of the constitution intimates as to how this power is to be exercised. That is left to be provided for in the "organic law" of the city, and the power is vested just where it is placed by the charter, and is to be exercised as therein provided. It is solely by virtue of the provisions to that effect in the city charter of Los Angeles, that the council of that city may exercise any of the legislative power of this city whatever (*Odd Fellows' Cemetery Assn.* v. *City and County of San Francisco,* 140 Cal. 226, 230, [73 Pac. 987]), and it may exercise only such power in that regard as it is authorized to do by the charter.

The Odd Fellows' Cemetery case, cited above, is cited by petitioners as authority for the proposition that the constitutional grant is to the council, this court having said therein: "All the legislative power of the city is by the charter vested in the board of supervisors. (Art. II, chap. 1, sec. 1.) By virtue of this clause the constitutional grant of the police powers of the state to the city goes directy to and vests in the board, which thereby becomes possessed of the right to exercise within the city limits the entire police power of the state, subject only to the control of general laws." It is here pointed out that the San Francisco charter contained provisions relative to the initiative substantially similar to those of the Los Angeles charter, and it is claimed that the decision must be taken as declaring that all of the legislative power of the city was in the board of supervisors, notwithstanding the presence of other provisions in the charter giving the electors certain powers in that regard. There was no question in that case as to the validity of the initiative provision of the charter, and what was said therein was said solely with reference to the right of a city to exercise within its limits the entire police power of the state, notwithstanding a certain provision of the charter which was claimed to limit the power. It was held that nothing contained in the charter could affect the grant made by the constitution, and that the city, under such constitutional grant, had the right to exercise the whole police power of the state so far as

local· regulations were concerned, subject only to the control of general laws. What was said in the case must be read in the light afforded by a knowledge of the precise question under consideration, and, so read, the quotation above set forth is direct authority upon the proposition that the legislative power of a city operating under a freeholders' charter is just where it is placed by the charter.

The effect of the provisions of the Los Angeles charter, as amended, is to give the legislative power vested in the city to ·the council and mayor, *subject to such control by the electors as is given them by the initiative and referendum provisions.*

The reserved power of the electors to directly enact such .ordinances as the council refuses to enact, as well as their· power to effectually veto ordinances adopted by the council, is made paramount to the power of the council and mayor, the council being without power to repeal or amend an ordinance so enacted, and the objection that under the initiative we have "two equal co-ordinate lawmaking bodies, the one absolutely independent of the other," is therefore without foundation. This feature renders the decision in *Ex parte Anderson*, 134 Cal. 69, [86 Am. St. Rep. 236, 66 Pac. 194], a decision strongly relied on by petitioner, inapplicable, for the only thing decided therein was that there could not be under our system of government two equal, co-ordinate lawmaking powers, "each existing without any restrictions the one upon the other."

It is urged that the effect of the provisions of the initiative amendment is to interfere with and suspend the exercise of the police power granted by section 11 of article XI, in that as an ordinance adopted by the people is repealable or amendable only by the people, and as special elections on such questions can be held only at intervals of six months, and the council itself can submit propositions for repeal or amendment only at a general municipal election, the making of necessary changes in the local laws of a police nature may be unreasonably delayed. The amendment does not purport to restrict or suspend in the slightest degree the exercise of the police power vested in the municipality, having reference solely to the manner of its exercise. Any ordinance enacted by the people may at any time be repealed or amended in the

manner provided in the charter. The rule against the suspension of the police power invoked by petitioner means no more than that the power is a continuous one, reposed somewhere, and one that cannot be barred or suspended by contract or irrepealable law, and never has been held to mean that a law enacted in the exercise of the police power must ever be open to instantaneous alteration. There are provisions in the nature of police regulations in the state constitution itself, and these cannot be repealed or amended except by the slow process of amending the constitution. The legislature of the state at each of its biennial sessions enacts numerous laws in the exercise of the police power of the state, which laws can be repealed or amended only at a succeeding biennial session, except in the rare case of an extra session. The freeholders' charters of the various cities of the state contain many provisions which are essentially police regulations, and these can be amended or repealed only with the assent of the majority of the electors at an election, which elections can be held only at intervals of two years (*Harrison* v. *Roberts*, 145 Cal. 173, 179, [78 Pac. 537]), and with the approval of the state legislature. So far as the objection here made is applicable to the provisions in city charters, it was overruled in *People* v. *Williamson*, 135 Cal. 415, 417, 418, [67 Pac. 504]. So far as this objection is concerned, there can be no distinction in principle between the case of a provision in the nature of a police regulation in the city charter and one to the same effect in an ordinance. In each case it is ever amendable or repealable in the manner provided by the organic law—in the one case the organic law of the state, in the other the organic law of the city. This, as was said in *People* v. *Williamson*, must satisfy the courts. The same objection might, as is suggested, be made with the same degree of force to the numerous provisions in freeholders' charters and acts of the legislature relative to municipal corporations which prohibit the passage of an ordinance on the day of its introduction, or prevent its taking effect until after publication.

The claim that the power to make police regulations upon a subject covered by an ordinance adopted by the people is taken from the *city* by the adoption of such ordinance finds its source in the erroneous assumption, which is the basis of many of

petitioner's arguments, that the city council is the "city."

It is urged that the initiative and referendum amendments are hopelessly in conflict, in that under the referendum amendment certain emergency ordinances take effect immediately on passage, and need not be referred to the people, while there is no exception declared in the initiative amendment. There is no claim that any emergency ordinance passed by the council is in conflict with the ordinance here involved, and it is unnecessary here to determine what the situation would be in such event. Obviously, however, the law would be construed either as making the emergency ordinance paramount, and precluding the application of the initiative to the subject-matter thereof, or as making the initiative ordinance paramount. We cannot see any legal objection to either method, or any unconstitutional interference by either with the exercise of the police power.

It is suggested that the proper exercise of the police power may be prevented by reason of the absence of sufficient funds to pay the expense of an election necessary to the adoption of an ordinance which repeals or amends some prior ordinance adopted by the people, section 18 of article XI providing that no county, city, etc., "shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two thirds of the qualified electors," etc. The same argument might with as much force be made as to a provision of law requiring the publication of an ordinance before its taking effect, or as to any requirement in connection therewith involving expense, however small. Surely a method adopted for the passage of ordinances cannot be declared unconstitutional upon any such ground. It is to be presumed that the municipality will provide the funds necessary for the administration of its government. If there be any offender against the rule invoked by petitioner in this connection, it is the constitutional provision cited by him.

The contention is made that the initiative amendment is in violation of section 13 of article XI of the constitution, which is as follows: "The legislature shall not delegate to any special commission, private corporation, company, association, or individual, any power to make, control, appropriate, super-

vise, or in any way interfere with any county, city, town, or municipal improvement, money, property, or effects, whether held in trust or otherwise, or to levy taxes or assessments, or perform any municipal functions whatever.''

So far, at least, as the prohibition concerning the delegation by the legislature to any ''special commission'' to perform any municipal function is concerned, it is clear that the whole object of the provision was to prevent the state legislature from interfering with local governments by the appointment of its own special commissions for the control of purely local matters. It was said in *People* v. *Hoge*, 55 Cal. 612, 618, that it was the manifest intent of this and other sections ''to emancipate municipal governments from the authority and control formerly exercised over them by the legislature.'' (See 2 Debates and Proceedings Constitutional Convention, p. 1066.) Certainly there is nothing in the language used which could be held to prohibit provision in the organic act framed for the government of a city for such commissions, special or otherwise, to be appointed or elected by the city as might be deemed necessary for the proper conduct of municipal affairs.

Under no circumstances, however, could the aggregate body of qualified electors of a municipality be held to be a ''special commission'' within the meaning of the constitutional provision. Any claim to the contrary appears so frivolous as not to merit discussion. Nor is there anything in the claim that the electors signing the petition for the submission of a proposed ordinance to the vote of the electors either constitute a ''special commission'' or perform any ''municipal function.'' Certainly they perform no act of legislation. Whatever ''municipal function'' is performed in the matter of the adoption of an ordinance under the initiative is performed either by the council, when it enacts the ordinance without submitting it to the electors, or by the electors, when it is submitted by the council. As in *People* v. *Ontario*, 148 Cal. 625, [84 Pac. 205, 207], the petition of the electors is merely an initiatory step, accomplishing no more than to compel a consideration of a proposed matter by those qualified to act and perform municipal functions, and does not itself constitute the performance of a ''municipal function'' in any proper sense of those words.

Aside from the prohibition as to "special commissions" contained in this section of the constitution, the utmost effect of the section is to prohibit the granting to private agencies, as distinguished from public agencies, the power to control in any degree the property or improvement work of a local subdivision or municipality, or to levy local taxes or assessments, or to perform any municipal function. Assuming the applicability of this provision to a freeholders' charter, as it is claimed was held in *Yarnell* v. *Los Angeles,* 87 Cal. 603, [25 Pac. 767], it is manifest that the electors of a municipality, in their capacity as such, do not constitute any such prohibited private agency.

It is earnestly urged that the initiative provision of the charter is inconsistent with the form of municipal government prescribed by title III of part IV of the Political Code (sec. 4354 et seq.). These sections constituted part of the original code, and provided a general form of government for cities. By section 4355, the legislative power of the city was vested in a common council. It is said that this is a general law with which the provisions of the freeholders' charter must be consistent. As to municipal affairs, it is sufficient if the provisions of a charter are consistent with the constitution. As we have shown, the method of exercising the legislative power of a municipality is a municipal affair. But were it otherwise, this provision of the Political Code could not be held to constitute one of the general laws with which charter provisions must be consistent. The old Political Code sections invoked were intended merely as a plan under which cities might be organized and governed, if so desired, and this was the sole object of their enactment. (*Ex parte Simpson,* 47 Cal. 127.) Except where specially made part of a city's charter by reference (*Ex parte Mauch,* 134 Cal. 501, [66 Pac. 183]; *Buck* v. *Eureka,* 109 Cal. 504, [42 Pac. 243]), they have not been held applicable. The sections of the title relative to refunding a bonded indebtedness, held applicable to Los Angeles in *Los Angeles* v. *Teed,* 112 Cal. 319, [44 Pac. 580], were part of a much more recent act of the legislature, intended, as this court held, to have general application. The old sections of the Political Code as to the form of government of cities stand, then, in precisely the same class of laws as does the Municipal Corporation Act

of 1883, under which towns or cities may now organize at their option. The constitutional grant to a city to frame its own charter, which, when ratified and approved, shall become its organic law, necessarily assumes that the form of government to be provided therein need not be the same as that provided by the legislature for municipalities generally, and it was for the very purpose of enabling cities to have such a local organization as their local needs demanded, that the authority to frame a charter for its own government was given to every city of over three thousand five hundred inhabitants. That such a. charter was not subject to the Municipal Corporation Act even prior to the ''municipal affairs'' amendment of 1896, is too plain for discussion; but if authority be needed, it is to be found in *People* v. *Bagley,* 85 Cal. 343, [24 Pac. 716].

Much stress is placed by petitioner upon the fact that in section 8 of article XI of the constitution the words ''legislative authority'' are used in designating the ordinary legislative body of the city. The use of these words is taken as indicating the intent of the constitution that no legislative power could be exercised except by some representative body such as a council, etc., which should have supreme authority as to all matters of legislative nature. We see no force in this contention. It was doubtless recognized by the framers of the constitution, as it must be by every one, that in the conduct of municipal affairs, it would be impracticable to do without the presence of a local legislative body of some kind, which should possess such powers in that behalf as might be granted to it, and that such a body would exist in every municipality. The words ''legislative authority'' as here used have no greater significance than such words as ''common council or other legislative body'' would have had. They were simply intended to designate the particular body which it was recognized would exist under some name or other in every municipality as the proper official agency to submit propositions for amendments to charters, and were not intended to define the powers of that body, or place it in a position where it would be beyond restrictions by the organic act of the city. Doubtless it is this body that is termed the ''governing body'' in section 1 of article XIV of the constitution, relative to the fixing of water rates, and it may be

that it is the "corporate authority" referred to in section 12
of article XI of the constitution, relative to the assessment
and collection of local taxes. (*Board of Education* v. *Board of
Trustees,* 129 Cal. 599, [62 Pac. 173].) But the use of these
various terms in various constitutional provisions means no
more than that the official body thereby referred to is to have
the power or perform the duty specified.

That the electors of a duly organized local subdivision of
this state may be authorized to directly participate in the
exercise of the legislative power of such subdivision cannot,
we think, be seriously disputed. There is certainly no pro-
vision of our constitution which expressly or by reasonable
inference prohibits it. There is no decision of this court
which holds that it is forbidden. What was said in the ma-
jority opinion in *Ex parte Wall,* 48 Cal. 279, 321, [17 Am.
Rep. 425], upon this point, was pure *dictum.* This was ex-
pressly pointed out by the later cases of *People* v. *Nally,* 49
Cal. 478, 480, and *People* v. *McFadden,* 81 Cal. 489, [22 Pac.
851], in the latter of which cases it was stated that the real
question in *Ex parte Wall* was "whether the legislature could
authorize the people of a given locality to suspend the opera-
tion, within such locality, of a general penal statute of the
state." (81 Cal. 493, [22 Pac. 852].) In the case of *People*
v. *Ontario,* 148 Cal. 625, [84 Pac. 205], which is the latest case
bearing on the question, it was held that the power to perform
the legislative act of prescribing the boundaries of territory
to be annexed to a municipality, which power, under our con-
stitution, could not be performed by the legislature itself, but
must by it be reposed elsewhere, could be given by the legis-
lature to the electors of the locality to be affected. We there
said: "There is no constitutional provision that intimates
that this power can be conferred only on some legislative
body, and not upon the electors of the locality to be affected,
and, in the absence of such a provision, the question as to
whether it shall be given to the one or the other is purely
one of policy, upon which the determination of the legislature
is conclusive." This appears to be the general rule as to
legislative power which a legislature is authorized to grant for
local purposes to local subdivisions, and is expressly recognized
by some of the cases cited by petitioner. For instance, in
*Clarke* v. *City of Rochester,* 28 N. Y. 605, 634, it is said: "But

while general statutes must be enacted by the legislature, it is plain the power to make local regulations, having the force of law in limited localities, may be committed to other bodies representing the people in their local divisions, or to the people of those districts themselves. Our whole system of local government in cities, villages, counties, and towns depends upon that distinction." (See, also, *People* v. *Reynolds*, 5 Gilm. (Ill.) 1, approvingly quoted in *Upham* v. *Supervisors*, 8 Cal. 383.) In the recent case of *Hindman* v. *Boyd* (Wash.), 84 Pac. 609, 612, the supreme court of Washington upheld the right of the people of the city of Spokane to reserve to themselves, in their charter, the power to compel the submission to the electors of every proposed ordinance granting certain kinds of franchises, such submission to be had whenever a certain percentage of the electors petitioned therefor. It was conceded that the granting of a franchise was a legislative act. The court said: "It is clear, therefore, that the powers of the mayor and council are such as are granted by the charter. If the people choose to provide in their charter that the power to grant franchises of a given character shall not be given wholly to the mayor and council, but shall be reserved to themselves, can it be said that the granting thereof is such a legislative act as cannot be exercised by the people themselves? The power to make a charter is in a sense a legislative one. It is well known that charters so made often contain much that is legislative in its nature, such as the adoption of a complete scheme for making special assessments and other similar elaborate and detailed provisions." We know of no state in which the right of the legislature to grant to the people of a local subdivision the power to directly discharge legislative functions in local matters is denied, except where the constitution of such state may reasonably be construed as forbidding such a grant, as may be held to have been the case in *Shumway* v. *Bennett*, 29 Mich. 451, [18 Am. Rep. 107], a case relied on by petitioner. Our own constitution certainly cannot be so construed. We entirely concur in what was said by the chief justice in *Ex parte Anderson*, 134 Cal. 69, 75, [86 Am. St. Rep. 236, 66 Pac. 194], where, speaking of the constitutional grant to every county, city, etc., embraced in section 11 of article XI, he said: "This grant to the counties of the power of local legislation is, of course, a

grant to the people of the respective counties. How they are to exercise the power, whether in their primary capacity by voting at the polls, as in the case of the adoption of a state constitution or of amendments thereto, or by their chosen representatives in boards of supervisors, is purely a matter of legislative regulation, and I cannot see how it is possible, upon any recognized principle of constitutional construction, to deny to the legislature the power to confer upon the qualified voters of the respective counties the right to make local laws which will be valid and effective within their territorial limits.'' This question, as already stated, was not determined by the majority of the court in that case.

If the legislature in providing by general statute for the organization and government of municipalities, can grant such power to the people thereof, there can of course be no question that such power may be vested in the people of a city by the provisions of a freeholders' charter framed by the city, ratified by the electors thereof, and approved by the legislature, under section 8 of article XI of the constitution.

Much that is said in the briefs of counsel assailing the initiative amendment, goes rather to the question of the policy of investing the electors of a municipality with such general power of local legislation than to the question of the validity of the law accomplishing this result. There may reasonably be differences of opinion as to whether the method devised will prove beneficial or not. However, the extent to which the electors of a municipality shall be permitted to directly discharge legislative functions in local affairs is purely a question of policy with which the courts have nothing to do. It is our duty to uphold the charter provision, if it be consistent with our federal and state constitutions, and that it is we have no doubt.

The initiative amendment was one of thirteen amendments to the Los Angeles charter ratified by the electors of Los Angeles at a general municipal election. They were approved by the legislature as a whole by a single concurrent resolution, the title to which simply stated that it was a resolution ''approving thirteen certain amendments to the charter of Los Angeles,'' etc. There is nothing in the point made by *amici curiæ* that this was a violation of the requirement that every act shall embrace but one subject, which subject shall be

expressed in its title. The method pursued was strictly in accord with the provisions of section 8 of article XI of the constitution, relative to the approval of charters and amendments thereto, as we read the same.

The writ is discharged and the petitioner remanded.

Shaw, J., Sloss, J., Lorigan, J., Henshaw, J., and Beatty, C. J., concurred.

McFARLAND, J., dissenting.—I dissent; but I will not undertake to do more just now than to briefly outline the skeleton of the argument which leads me to the conclusion that the "initiative" as contained in the Los Angeles charter is unconstitutional and void.

I will not stop to discuss the forcible contention by counsel for the petitioner that the provision of the charter under consideration is violative of certain parts of our state constitution, because, in my opinion, the provision is violative of that part of the constitution of the United States which declares that "Congress shall guarantee in each state a republican form of government." It is, in my judgment, a narrow and incorrect view of that provision of the United States constitution to hold that it concerns Congress alone, and that a state may violate it at its will so long as Congress does not choose to interfere. The provision declares a great constitutional principle, and must be observed by all coming within its purview. The correct construction, is that given by the United States supreme court in *Minor* v. *Happersett,* 21 Wall. 162, where it is said: "The guarantee necessarily imposes a duty on the part of the states themselves to provide such a government." Therefore every act done by a state which is inconsistent with and violative of the theory of a republican form of government is invalid.

Now, what is a republican form of government? These words are not defined in the constitution itself; like other words used in that instrument, we must look for their meaning to the general and usual sources and authorities which determine the signification of English words and phrases. And an examination of those sources leaves no doubt as to the meaning of the phrase in question. It is defined in the Federalist, in legislative debates, in judicial opinions, in text-

books of the law, and in the standard dictionaries of the language. I shall not quote from these authorities. The meaning of the phrase as derived from these sources is correctly and concisely stated in Webster's dictionary as follows: "A state in which the sovereign power resides in the whole body of the people, and *is exercised by representatives selected by them.*" A republican form of government is one in which the people select those who are to make their laws, and is radically different from a pure democracy, in which the people collectively and as their own original act make the laws. And whenever under our American system of representative government a state undertakes to destroy the representative system and install in its place, as the lawmaking power, the people, either acting in a mass-meeting, or enacting laws by ballot, in their original capacity, it undertakes to do an unconstitutional thing which is void. And it is to be observed that the initiative provision of the Los Angeles charter is not confined to merely reserving to the people the right to approve of measures which refer to one or two special subjects; it gives them full affirmative sway over the whole matter of municipal legislation—they may propose and pass by vote "any ordinance."

It is said that although the state might not have power to take the lawmaking power of the state from a representative body and confer it upon the whole people, still it may do so as to part of the state organized as a municipality. But what the state cannot do itself it cannot authorize a municipality to do; the act is one which the state cannot do at all, and therefore cannot make such act valid in any part of its territory. Moreover, the state cannot do indirectly that which it cannot do directly; and considering the wide power of legislation which the people of the state have already given the municipalities, the latter are exercising lawmaking power almost equal to that of the state; the initiative in the Los Angeles charter embraces a large power of general legislation which usually belongs to the state. Already a municipality is independent of the state as to all legislation relating to municipal affairs; and we all know how difficult it is to determine how far legislation as to "municipal affairs" runs into general legislation. Moreover, considering the generosity with which the people of the state have given away their

powers to municipalities, there is no telling how much further they may go in that direction. If this disposition continues, the time may come when California will be not much more than a shadow of a name—used to designate the territory within which exists certain almost free cities and independent municipalities. Why should the people of the state, with their present love of municipal power, restrict the legislative power of a municipality to "municipal affairs"; why should not each municipality have its own substantive law in all ordinary matters of legislation—no matter what the law on any subject might be in other municipalities, or in other parts of the state. And the initiative would then cover substantially all the legislation in the state.

Of course, the expediency or wisdom of the law under consideration is not a judicial question; but it is well to remember that in a government republican in form representative legislators are persons who are presumed to have, at least, some special qualifications for legislative work, they are chosen some time before they are called to act, they meet and consult with each other, they are not too much hurried in their action, and take full time for consideration of proposed legislation. In a pure democracy, which is represented in part by the initiative, whenever demagogues, pseudo-reformers, or promoters of discontent are able to "fool" the people for only a short "part of the time" by a mischievous proposition, they can by a hurried special election have the proposition voted into a law before there is an opportunity for a sober second thought. It admits the very evils which the representative form of government was intended to guard against.

I cannot refrain from expressing regret at the apparent readiness of many of the people of this state to abandon prominent features of our American system of government—the wisest and best system ever yet devised and put into successful operation.