[Sac. No. 1852. In Bank.—June 25, 1910.]

HORACE G. PLATT, Appellant, v. CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation), et al., Respondents.

FREEHOLDERS' CHARTER OF CITY AND COUNTY OF SAN FRANCISCO—CONSTRUCTION—POWER TO ACQUIRE "PUBLIC UTILITIES"—STREET-RAILROADS INCLUDED.—Though article XII of the freeholders' charter of the city and county of San Francisco entitled "Acquisition of Public Utilities," as amended in 1903, does not include the words "street-railroads," yet its provisions as amended by the addition of section 14 thereto in 1907, are comprehensive enough to authorize the acquisition, construction, and completion of municipally owned "street-railroads."

ID.—DEFINITION OF "PUBLIC UTILITY."—The term "public utility" as used in section 14 and the other sections of article XII of the freeholders' charter, is to be understood as including any such utility as is employed in the rendition of *quasi* public service, such as water-works, gasworks, a telephone system, street-railroads, etc., and was manifestly used throughout article XII of the charter as embracing all such utilities.

ID.—PROVISIONS OF ORIGINAL CHARTER.—The original freeholders' charter enumerated certain specific utilities in section 1 thereof, including street-railroads, and required the city engineer to make estimates every two years of each of such specified utilities.

ID.—OBJECT AND PURPOSE OF AMENDMENT OF 1903—EFFECT NOT TO PREVENT NEW ACQUISITION.—The only object and purpose of the amendment of 1903, omitting such enumeration, was to relieve the city engineer and the board of the labor of estimates every two years, and to entail such labor only as any particular utility should be acquired. Such purpose cannot be held to express an intent that the supervisors could not thereafter acquire any of the utilities omitted from that section as amended, since it still provided for "the acquisition, construction and completion of any public utility or utilities," and also left unchanged the preamble declaring

it "to be the intention of the city and county that its public utilities shall be gradually acquired and ultimately owned by the city and county."

ID.—RULE OF EJUSDEM GENERIS.—It is further to be considered that the omission of the specific enumeration of utilities was for the purpose of making the utilities rather broader than narrower, and to prevent the possible application of the principle of *ejusdem generis.*

ID.—GENERAL POWER OF STATE TO CONFER MUNICIPAL POWER OVER PUBLIC UTILITIES.—The state has general power to invest its municipalities with power to acquire and operate local public utilities, such as are generally operated in a city by public service corporations, such as waterworks, gas or electric light works, street-railways, etc. It is purely a question of local policy with each state what shall be the extent and character of the powers its various political organizations shall possess.

ID.—POWER VESTED BY FREEHOLDERS' CHARTER.—Local power over public utilities may be vested in a city by a freeholders' charter, under the constitution, approved by the people and by the legislature as a whole, and also by amendments thereto likewise approved. Local power so vested has the same force and effect, as if contained in a special charter constitutionally enacted.

ID.—POWER OF CITY TO FRAME CHARTER FOR ITS OWN "GOVERNMENT."—The word "government," used in its permissive powers to a city to "frame a charter for its own government," is not to have a narrow construction, but it includes every function which may be allotted to a municipality to perform.

ID.—POWER TO SELL OR LEASE UTILITIES ACQUIRED—CONSTRUCTION—PROVISIONS OF CHARTER—CONSTITUTION.—The power given in section 14 of article XII of the charter to the city and county to sell or lease public utilities acquired thereby, subject to the provisions and limitations of the charter, is not to be construed as allowing any sale or lease in violation of any provision of the constitution.

ID.—ACQUISITION OF UTILITIES—SOLICITING OFFERS FOR SALE BEFORE PRELIMINARY ORDINANCE.—Under the mandate of the charter that "before submitting propositions to the electors for the acquisition by original construction," etc., "of public utilities, the board of supervisors must solicit and consider offers for the sale to the city and county in order that the electors may have the benefit of acquiring the same at the lowest possible cost thereof," the soliciting of the offers for sale may properly precede the preliminary ordinance declaring the demands of public interest and necessity for the acquisition by construction of or purchase of a similar utility, in order that the board may know whether and upon what terms an existing utility can be acquired and be enabled more satisfactorily to determine exactly what the public interest and necessity demand, whether the acquisition of an existing utility or the original construction of such a utility.

ID.—MODE OF SOLICITING OFFERS OF SALE—RESOLUTION—PUBLICATION NOT REQUIRED.—The soliciting of offers of sale is not required to be made by ordinance rather than by resolution. The resolution calling for such offers does not come within the purview of section 15 of chapter 1 of article II of the charter, requiring publication for five days.

ID.—ORDINANCE DETERMINING NECESSITY FOR ACQUISITION "BY CITY AND COUNTY."—It is necessary that the preliminary ordinance shall determine the demands of public interest or necessity for "the acquisition or completion by the city and county" of the utility proposed to be acquired. Yet when the ordinance passed by the board of supervisors of the city and county declared that "the public interest and necessity demand the construction of street-railways over and along" certain described streets, situated therein, and directed the board of public works to procure and file estimates of costs thereof, and the ordinance was in the form prescribed by the charter of the city and county, leading up to the acquisition by the city and county of public utilities, the ordinance sufficiently expressed the determination by the board that the public interest and necessity demand the construction of certain street-railways "by the city and county," though those words were not expressly used therein.

ID.—ORDINANCE NOT DEFECTIVE IN NOT INCLUDING "ACQUISITION."—The ordinance for the "construction" of street-railroads, was not defective in not including the "acquisition of an existing street-railway," where the bonded indebtedness authorized by the electors and proposed to be incurred is not in any part for the acquisition by purchase of any existing utility, but only for the "construction" thereof.

ID.—MEANING OF "CONSTRUCTION"—COMPLETION.—The word "construction" as used in the ordinance means the original construction of the street-railroads proposed to completion.

ID.—PLANS AND ESTIMATES—REGULARITY—ADOPTION BY ORDINANCE FOR BONDED INDEBTEDNESS.—There was no irregularity in calling for plans and estimates of the cost of the proposed street-railroads, or in the plans and estimates themselves, and there was a sufficient description of the utility in the resolution calling for the plans and estimates. The ordinance of the board of supervisors determining that a bonded indebtedness was essential, sufficiently adopted the plans and estimates proposed by the board of public works, as its own.

ID.—ACTION BY TAXPAYER TO ENJOIN BONDS VOTED—COMPLAINT—MONEY PREVIOUSLY RAISED FOR STREET-RAILROAD—CONSTRUCTION AGAINST PLEADER.—In an action by a taxpayer to enjoin the issue of the bonds voted by the electors, where the complaint alleges that the city and county had appropriated large sums of money specified out of current revenues, for the construction of a municipal railroad, none of which has ever been expended for that purpose, but there is no allegation that the moneys are now in the possession or control of the city and county or are available for that purpose,

it must be presumed against the pleader that such money is not so available.

ID.—AFFIDAVIT ON HEARING FOR INJUNCTION—SHOWING THAT MONEYS WERE NOT AVAILABLE.—Where upon an application of the plaintiff for an injunction, a showing that such moneys not having been expended were not available, but had been appropriated to current expense under the charter, and the payment thereof for a street-railroad had been enjoined by the courts, although such affidavit cannot be considered on demurrer to the complaint, yet it is consistent with the presumption against the pleader that the complaint does not show that the moneys so appropriated are available.

ID.—DETERMINATION OF PUBLIC INTEREST BY SUPERVISORS CONCLUSIVE.— The determination of the question of public interest or necessity by the board of supervisors to construct a public utility is conclusive upon the courts in the absence of fraud. There is no material difference in this regard between such a determination, and a determination by a board of supervisors that an ordinary public road or street or public ferry is necessary; and it is well settled that the latter is not subject to review by the courts.

ID.—UNTENABLE OBJECTION TO GEARY STREET ROAD—OCCUPATION BY ANOTHER ROAD — EXPIRED FRANCHISE — PRESUMPTION AGAINST PLEADER.—The objection urged by plaintiff that the proposed Geary Street railroad will cover more than ten blocks occupied by another road, is not tenable, as it must be presumed against the pleader that the Geary Street franchise has expired by limitation, there being no allegation in his complaint to the contrary.

ID.—RIGHT OF AGREEMENT AS TO JOINT OCCUPATION FOR MORE THAN FIVE BLOCKS.—There being allowed by section 499 of the Civil Code, as amended in 1907, a joint occupation of a road for more than five consecutive blocks, it cannot be assumed in an action to enjoin the issue of bonds voted, that such arrangements cannot be made, if required by a municipally owned street-railroad.

ID.—POWER OF CITY AND COUNTY.—The city and county of San Francisco has the power to construct and operate street-railways and to incur a bonded indebtedness for such purpose.

ID.—PROCEEDINGS LEGITIMATE—JUDGMENT AND ORDER DENYING INJUNCTION AFFIRMED.—The proceedings of the city and county in the incurring of a bonded indebtedness were legitimate and free from substantial irregularity, and the judgment of the trial court sustaining the bonds and denying an injunction against their issuance must be affirmed.

APPEAL from a judgment of the Superior Court of Tehama County and from an order denying an injunction. John F. Ellison, Judge.

The facts are stated in the opinion of the court.

Morrison & Brobeck, and Platt & Bayne, for Appellant.

Percy V. Long, City Attorney of San Francisco, and Thos. E. Haven, and John T. Nourse, Assistants, for Respondents.

ANGELLOTTI, J.—This is an action brought by a taxpayer of the city and county of San Francisco to obtain a judgment perpetually enjoining defendant city and county and certain of its officers from proceeding in the matter of printing or lithographing, signing, etc., advertising for sale, opening bids for the purchase of and selling certain municipal bonds, in the sum of one million nine hundred thousand dollars, to be known as the "Geary Street Railway Bonds," and other municipal bonds in the sum of one hundred and twenty thousand dollars, to be known as the "Market Street Railway Bonds." A demurrer to the complaint was sustained and judgment was thereupon entered for defendants. These are appeals by plaintiff from said judgment and from an order denying plaintiff's application for a preliminary injunction.

We shall assume for the purposes of these appeals that all questions raised by the plaintiff as to the validity of the proposed bonds may be raised by a taxpayer in a proceeding of this character. The proposed bonded indebtedness is one purporting to be authorized by a vote of the electors of the city and county at a special election held on December 30, 1909, for the purpose of the construction and completion of certain proposed municipally owned street-railways.

Assuming for the moment the validity of the provisions of the freeholders' charter of the city and county of San Francisco, which was framed, adopted, and approved under the provisions of section 8 of article XI of our constitution, relative to the acquisition, construction, and completion of public utilities by said city and county, there can be no doubt that they are comprehensive enough to authorize the acquisition, construction, and completion of municipally owned street-railways. In so saying we may freely concede, as claimed by the plaintiff, that such a power in a municipality can exist only when expressly conferred by the state. It is true that the charter of the city and county nowhere specifically designates a "street-railroad" as a thing which may be so acquired, constructed, or completed, but the grant of power to acquire "any

public utility" clearly includes street-railroads.   Section 14 of article XII of the charter, adopted by the electors of the city and county in the year 1907 and approved by the legislature of the state November 23, 1907 (Stats. Ex. Session 1907, p. 37) is as follows:—

"The city and county shall have power to acquire, construct or complete any public utility from funds derived from taxes levied for that purpose, or from funds derived from the sale of bonds issued for that purpose, as is provided in this charter, and may operate, maintain, sell or lease the same subject to the other provisions and limitations of this charter."

This is the last section of the article in such charter entitled, "Acquisition of Public Utilities," an article contained in the charter when originally adopted in 1899, [Stats. 1899, p. 346]. Unless the effect of the section just quoted is limited by other provisions of the article, it constitutes a clear authorization, in express terms, to the city and county to acquire, construct, or complete whatever is embraced by the term "public utility" used therein.   We do not desire to be understood as intimating that the article as it existed prior to the addition of this section was not sufficient to show such an authorization, but the section certainly conferred the power as clearly and definitely as any language that could be used.   The only question, then, is as to the meaning of the term "public utility" as used in this section and in the other sections of the same article.   The term is certainly broad enough to include a street-railroad, is one that would ordinarily be understood as including any such utility as is employed in the rendition of *quasi* public service such as waterworks, gasworks, a telephone system, street-railroads, etc., and was manifestly used throughout this article of the charter as embracing all such utilities. As originally adopted, article XII of the charter expressly declared the purpose and intention of the people of the city and county to gradually acquire and ultimately own its "public utilities." Section 1 provided that at least every two years until this object had been attained, the supervisors must procure through the city engineer plans and estimates of the actual cost of the original construction and completion by the city and county "of waterworks, gasworks, electric-light works, steam, water or electric-power works, telephone lines, street-railroads, *and such other public utilities* as the supervisors or the people by peti-

tion to the board may designate," and contained an additional special provision as to waterworks which is of no importance here. The following sections provided that the supervisors should, at as early a date as they may deem for the best interests of the city and county, enter into negotiations for the permanent acquisition of such, or any, "of said public utilities" as they may regard most important to be first acquired, and submit to the electors propositions for such acquisition, that they must submit such a proposition as to "any public utility" whenever petitioned so to do by a certain proportion of the electors, and that whenever the cost of any public utility sought to be acquired could not be paid out of the annual revenues of the city, a proposition for a bonded indebtedness must also be submitted to the electors. It is not and could not be questioned that the terms "public utility" and "public utilities" as used in the article as originally adopted included street-railroads. Learned counsel for plaintiff rely entirely on certain amendments to the charter, approved by the legislature February 5, 1903, and particularly on the amendment of section 1 of said article (Stats. 1903, p. 591). The express declaration of the purpose to gradually acquire and ultimately own its "public utilities" was not changed. By the amendment of section 1, the requirement that the supervisors must at least every two years procure plans and estimates of the cost of public utilities was eliminated. This provision, it will be borne in mind, was the one designating certain public utilities by name. For this was substituted a provision to the effect that whenever the supervisors shall by ordinance determine that the public interest or necessity "demands the acquisition, construction or completion *of any public utility* or *utilities* by the city and county," or whenever a sufficient petition therefor is presented by the electors, the supervisors must procure such plans and estimates of cost thereof. The special provision as to waterworks was left practically untouched, thus leaving "waterworks" the only utility anywhere designated by name in the article. The other amendments were of no importance so far as the question before us is concerned. It is obvious that the meaning of the term "public utilities" as used in the original article was in no way changed or intended to be changed by the amendment of 1903, and that it was used in that amendment and likewise in section 14 of article XII adopted in 1907,

with the same meaning. The principal object of the amendment of 1903 cannot be more clearly stated than it was by the learned judge of the trial court, who said: —

"The only object and purpose in amending section 1 was to relieve the city engineer and the board from the duty of having plans, specifications and estimates of the cost and construction and completion of all these named public utilities drawn up every two years. It was evidently found to impose a useless and onerous burden on the board of public works and the city engineer.

"So the section was changed to provide that the city engineer need not draw plans and estimates every two years, but whenever the board decided to acquire *any public utility* then, and only then, it should be his duty to draw plans and estimates. This was the sole purpose of the amendment, and it cannot be held to be an expression of intent that thereafter the city and county could not acquire any of the utilities specifically named in the original, but omitted from these sections as amended."

To this may be added the statement that the omission in section 1 as amended of any designation of specific utilities, was, as stated in a quotation contained in defendant's brief, "for the purpose of making it broader rather than narrower and to meet the possible application of the principle of *ejusdem generis.*" There is no possible foundation for the claim that the intention was to make waterworks the only public utility that could be acquired by the city and county. There is nothing in *Hyatt* v. *Williams,* 148 Cal. 585, [84 Pac. 41], in any way inconsistent with our conclusion on this branch of the case.

This brings us to the question of the validity of the charter provisions relative to public utilities.

We do not understand that it is seriously claimed that the state may not invest its municipalities with the power to acquire and operate any such necessary public utility as is generally owned and operated in a city by what is ordinarily known as a public service corporation, such as waterworks, gas or electric-light works, street-railways, etc. The existence and proper conduct of such utilities in cities clearly constitute a public affair, one relating very closely to the well-being, safety, health, advantage, and convenience of all the

CLVIII Cal.—6

inhabitants thereof, and are well within the legitimate func-
tions of government. If the state deems it conducive to the
welfare of the inhabitants of a city that the municipality shall
have the power to itself acquire and operate for their benefit
any such utility, in order that they may not be dependent
solely on the establishment or operation thereof by some pri-
vate corporation, or person, there can be no doubt of its right
to confer such power on the municipality. As to such utili-
ties as waterworks and artificial light-works this power has
long been exercised by municipalities in various sections of
the United States under authorization from their respective
states, and this is particularly true in California. We do
not understand that the right of a state to invest its munici-
palities with such power has ever been doubted. There is no
difference material here between an artificial lighting plant
to supply the inhabitants with light and a street-railway.
Both are matters pertaining to the internal affairs of the state,
as to which the state has absolute power. It is purely a
question of local policy with each state what shall be the
extent and character of the powers which its various political
organizations shall possess (see *Claiborne* v. *Brooks*, 111 U. S.
400, 410, [4 Sup. Ct. 489] ; *In re Pfahler*, 150 Cal. 71, 79,
[88 Pac. 270] ). There is no provision of our state consti-
tution which either expressly or by implication forbids the
acquisition, ownership, or operation of any of such public
utilities by a municipality, or prohibits the granting to a
municipality of the power to acquire, own, and operate them.
To the contrary, the constitution expressly recognizes that
a municipality may be invested with the power to acquire
and control public utilities by declaring in section 19 of article
XI that any individual or company incorporated for that
purpose shall have the privilege of using the public streets
of a city for pipes and conduits so far as necessary to supply
the city and its inhabitants either with gas-light or other
illuminating light, or with fresh water for domestic and all
other purposes, "in any city where there are no public works
owned and controlled by the municipality for supplying the
same with water or artificial light."

Of course, a grant by the state of such power is essential
to its exercise by a municipality, municipalities being con-
fined to the exercise of such powers as are expressly or by

necessary implication conferred by the state. The question presented here is whether under the provisions of our constitution, such power in regard to public utilities can be granted or conferred by the state by provisions contained in a freeholders' charter framed by the municipality itself under section 8 of article XI of the constitution and approved by the legislature of the state by concurrent resolution. If this question be answered in the negative, the provisions of the San Francisco charter relative to the acquirement of public utilities would be ineffectual for any purpose, and there being no other law purporting to confer such power on San Francisco, that city and county would be without the power.

But it seems very clear to us, that, under our system, the power can be so conferred or granted, and that action by the state legislature other than its action in approving the charter by concurrent resolution, is in no wise essential.

Section 8 of article XI of the constitution, provides that any city of the requisite population named therein, through a board of freeholders elected by the electors "may frame a charter for its own government, consistent with and subject to the constitution." A charter so framed must be submitted to the qualified electors for approval. If approved by the electors it must be submitted to the legislature of the state for approval or rejection as a whole. "Such approval may be made by concurrent resolution, and if approved by a majority vote of the members elected to each house, it shall become the charter of such city, or, if such city be consolidated with a county, then of such city and county, and shall become the organic law thereof, and supersede any existing charter, . . . and all amendments thereof, and all laws inconsistent with such charter." The section provides a method for amendments to such charter, under which approval by the electors and state legislature must be had as in the case of the original charter.

It cannot be questioned, in view of our decisions, that, as to all matters properly embraced therein, the provisions of a freeholders' charter so framed and approved have the same force and effect as they would have if contained in a special charter enacted as an ordinary law by a legislature not restrained in any manner by constitutional limitations. The section of the constitution thus referred to provides a special

mode for the enactment of the "organic law" of such of the
cities having the requisite population as desire to take advan-
tage of its provisions. It was said by this court in *Sheehan*
v. *Scott*, 145 Cal. 684, 688, [79 Pac. 350, 351], speaking of
such a charter: "The act of the city in formulating the char-
ter and determining the provisions to be included therein
has the same force and authority as would a charter with
the same provisions enacted by a legislature that was not
restrained by any constitutional limitations. Its adoption by
the city and approval by the legislature in the manner pre-
scribed by said section is the mode prescribed by the consti-
tution for its enactment, and has the same effect as that of
a law which is passed by bill, under the provisions of section
15 of article IV." Again it was said, speaking of the validity
of provisions in a freeholders' charter providing for the direct
exercise of legislative power by the electors: "If the legis-
lature, in providing by general statute for the organization
and government of municipalities, can grant such power to
the people thereof, there can, of course, be no question that
such power may be vested in the people of a city by the pro-
visions of a freeholders' charter framed by the city, ratified
by the electors thereof, and approved by the legislature under
section 8 of article XI of the constitution." (*In re Pfahler*,
150 Cal. 71, 92, [88 Pac. 270, 279].)

The only question then appears to be whether such provi-
sions as are here involved may be properly included in a free-
holders' charter, or to state it in another way, is it within the
scope of such a charter to define the powers that shall be
exercised by a municipality? It is only by finding some lim-
itation in our constitution as to freeholders' charters that
distinguishes them in this regard from ordinary municipal
charters that any but an affirmative answer can be given to
this question. The "charter" of a municipality is, as Mr.
Dillon says, *"its constitution,"* giving to it "all the powers
it possesses (unless other statutes are applicable to it)," and
invariably defines its powers, including its special and pecu-
liar powers, and includes "a minute and detailed enumeration
of the powers" of its legislative body. (1 Dillon on Municipal
Corporations, sec. 39.) Prior to our present constitution the
charter of each municipality was the special act of the state
legislature creating it, defining its powers and providing for

all the details of its government.  Some of such charters
still remain in force, the municipalities possessing the same
not having elected to organize. under the general laws for
the organization of municipal corporations or to obtain a
freeholders' charter under section 8 of article XI of the con-
stitution.  As to these, such special legislative act constitutes
the "charter" of the municipality.  (See *Ex parte Helm,* 143
Cal. 553, [77 Pac. 453] ; *Ex parte Lemon,* 143 Cal. 558, [77
Pac. 455].)  The constitution of 1879 forbade the creation
of municipal corporations by special law, and required the
legislature in lieu thereof, to provide by general laws for the
incorporation, organization, and classification of municipal cor-
porations according to population.  (Const., Art. XI, sec. 6.)
This is the scheme referred to by Mr. Dillon in section 41
of his work on municipal corporations, being, as he says, to
grade corporations into classes according to their size as into
cities of the first class, second class, etc., "and to bestow upon
each class such powers as the legislature deems expedient."
Under this section we have our general Municipal Corpora-
tion Act, providing for each of the six classes of municipal
corporations established thereby "such a municipal charter
as was considered by it (the legislature) to be necessary for
cities of the population embraced within that class."  (*Ex
parte Jackson,* 143 Cal. 564, 568, [77 Pac. 457].)  The por-
tion of such act applicable to any city organized thereunder
is in fact the "charter" of such city "in the same sense that
a special act incorporating a city, adopted prior to our pres-
ent constitution . . . is a charter" (*Ex parte Jackson,* 143
Cal. 569, [77 Pac. 459]) ; and there can be no doubt that
provisions therein prescribing and conferring the powers of
such a city, including the power to acquire, own, and operate
such a public utility as is here involved, are within the proper
scope of such an act.  Certainly such has been the construc-
tion uniformly given to this section of the constitution by the
legislature ever since the adoption of the constitution (see
*Board of Railroad Commissioners* v. *Market St. Ry. Co.,* 132
Cal. 680, [64 Pac. 1065]), and the construction uniformly
adopted by the courts.  There is no distinction material to the
question we are now considering between the charters we
have referred to and the freeholders' charter provided for
by section 8 of article XI of the constitution.  The whole

purpose of the scheme of such freeholders' charter, originally was to enable any city having more than a certain number of inhabitants, originally one hundred thousand, to adopt, subject to the approval of the legislature and in lieu of the charter provided by the general Municipal Corporation Act or the old special legislative charter, such a charter, to use the language of the learned trial judge, as the people thereof "deemed appropriate and adequate to its situation and condition and the full and proper administration of all its affairs." The charter so adopted was to be "the charter of such city" and "the organic law thereof." There never could have been any suspicion in the minds of the framers of this section or in the minds of the people adopting it that the charter thus provided for should not be as comprehensive in its scope as the ordinary legislative charter. That such charter should define the powers which the city should have, and that the adoption and approval of the charter in the manner provided should confer the powers (provided, of course, no law of the state prohibited the conferring of such powers) just as in the case of the ordinary legislative charter, was so obviously intended that it should not be necessary to discuss the matter at all.

Learned counsel for plaintiff seek to find a limitation on the scope of such freeholders' charter in the use of the words "for its own government," in the permissive provision of section 8 of article XI, "Any city . . . may frame a charter *for its own government,* consistent with and subject to the constitution," etc. The theory appears to be that the word "government" was used with reference to the recognized distinction between governmental and proprietary powers of a municipality, with the design to strictly limit the powers that could be conferred by such a charter to the exercise of purely public and governmental functions as distinguished, to use the language of Mr. Dillon, from "powers . . . not . . . conferred, primarily or chiefly, from considerations connected with the government of the state at large, but for the private advantage of the particular corporation as a distinct legal personality." (1 Dillon on Municipal Corporations, sec. 66.) The operation by a municipality of an electric lighting plant for the purpose of furnishing light to its inhabitants for domestic purposes has been held by this court to fall

within the latter class (*Davoust* v. *City of Alameda,* 149 Cal. 69, [84 Pac. 760]). On this distinction, says Mr. Dillon, in the section last referred to, rests the doctrine of implied liability of municipal corporations for the negligence of their servants, agents, or officers in the execution of corporate duties or powers. This division of "municipal functions" exists for certain purposes, among which is the purpose just stated of making municipalities liable to private action in certain cases (see 1 Dillon on Municipal Corporations, sec. 67; concurring opinion of Justice Shaw in *Davoust* v. *City of Alameda,* 149 Cal. 69, [84 Pac. 760]), but it affords no warrant whatever for the narrow and unusual meaning sought by learned counsel to be attributed to the word "government" as used in section 8 of article XI of the constitution. "Government" is defined as being the "exercise of authority in the administration of the affairs of a state, community or society" (Century Dictionary), "the act of governing, or the state of being governed, especially authoritative administration of the affairs of a state or other community." (Standard Dictionary.) These definitions include every function which may lawfully be allotted to a municipality to perform. No other meaning can reasonably be attributed to the word "government" as used in the section under consideration. To hold otherwise would be to defeat in a most material part the manifest purpose of the whole scheme of freeholders' charters which we have hereinbefore described.

As we have seen, under section 14 of article XII the charter purports to authorize the city and county of San Francisco not only to acquire, construct, and complete any public utility and operate and maintain the same, but also to sell or lease the same subject to the other provisions and limitations of the charter. It is urged that a sale or lease might be made upon such terms and under such circumstances as to constitute a lending of public credit, or a conferring of special privileges and immunities upon a private individual or corporation in a manner violative of certain provisions of the state constitution, and the theory of counsel, as we understand it, is that the whole section must be held void because it purports to authorize such a sale or lease. That there may be either a sale or lease upon such terms and under such circumstances as not to be violative of any constitutional pro-

vision we do not understand to be disputed. Of course the charter cannot be construed as purporting to authorize any other kind of sale or lease.

The only other matters requiring discussion are some of the claims made by plaintiff as to the validity of the proceedings taken by the various officials, "tested in the terms of the charter."

Section 1 of article XII of the charter, as amended in 1903 (Stats. 1903, p. 591) provides that "whenever the board of supervisors by ordinance, as hereinafter provided, shall determine that the public interest or necessity demands the acquisition, construction, or completion of any public utility or utilities by the city and county," or whenever a proper petition "for the acquisition" thereof by electors is filed, the supervisors must procure from the board of public works, through the city engineer, plans and estimates of the cost of original construction and completion by the city and county of the same. Section 5 of the same article, as amended in 1903 (Stats. 1903, p. 593), provides that whenever the board of supervisors shall determine that the "public interest or necessity demands the acquisition, construction or completion of any public utility or utilities, it shall specifically declare such determination by an ordinance, which shall also direct the board of public works to procure and file plans and estimates," etc. When the cost of the same can be paid out of the annual revenues the supervisors shall, as soon after the filing of such plans and estimates as it may deem for the best interests of the city and county, enter into such negotiations and contract "as may be necessary for the acquisition of the same." If such cost shall so far exceed the annual revenues as to make a bonded indebtedness essential, a proposition or propositions for the acquisition of such utility or utilities must be submitted to the electors at a special election. Section 2 of article XII, as amended in 1903 (Stats. 1903, p. 591), provides that "before submitting propositions to the electors for the acquisition by original construction or condemnation of public utilities, the board of supervisors must solicit and consider offers for the sale to the city and county of the existing utility, in order that the electors may have the benefit of acquiring the same at the lowest possible cost thereof."

On October 18, 1909, the board of supervisors adopted and

on October 20, 1909, the mayor approved a resolution soliciting offers for the sale to said city and county of any existing street-railway system on any of the streets over which the proposed railroads were to be constructed, such offers to be submitted at any time prior to November 15, 1909, notice of which ordinance it must be assumed was given in the manner prescribed therein.

On October 25, 1909, the board of supervisors adopted and on October 26, 1909, the mayor approved an ordinance whereby it was "determined and specifically declared that the public interest and necessity demand the *construction* of street-railways over and along" said streets, and directing the board of public works to procure and file with the supervisors plans and estimates of the cost of original construction and completion of said railways, the same to be based upon the use of electricity as motive power.

On November 15, 1909, the board of public works filed said plans and estimates with the board of supervisors, showing the cost to be $1,900,000 for the Geary Street road and $120,000 for the Market Street road.

On November 22, 1909, the board of supervisors adopted and the mayor approved ordinances declaring the necessity of a bonded indebtedness and calling a special election for December 30, 1909.

It is urged that the resolution soliciting offers for the sale to the city and county of existing utilities was void, because adopted seven days prior to the passage of the ordinance declaring that the public interest and necessity demand the construction of said utilities, and passed in the absence of the adoption of any ordinance declaring the necessity for the acquisition by *purchase* of said utilities, and that all subsequent proceedings looking to the original construction thereof are in consequence void. We have no doubt that the soliciting of offers for the sale of any existing utility may precede the ordinance declaring the demands of public interest and necessity for the acquisition by construction or purchase of a similar utility. Indeed it would seem advisable that it should so precede in order that the board may know whether and upon what terms an existing utility can be acquired and consequently be enabled to more satisfactorily determine exactly what the public interest and necessity demand, the

acquisition by purchase of an existing utility or the original construction of such a utility. It is true, as said by counsel, that no purchase can be consummated except after ordinance declaring the determination of the board as to the demands of public interest and necessity, but we do not see that this in any way affects the validity of the resolution soliciting offers for consideration. If any offer is made in response to the solicitation such proceedings may then be taken, looking to its acceptance, as are required by law, including the preliminary and essential ordinance determining the necessity of acquiring by purchase the existing utility which is offered. The mandate of the charter is simply that "before *submitting propositions to the electors* for the acquisition by original construction," etc., the board must solicit such offers of sale." The ordinance submitting the propositions to the electors was adopted and approved November 22, 1909, *after* the soliciting of offers and *after* the expiration of the time named in the resolution during which offers would be received and considered. It is not alleged in the complaint that any offer of sale was made by the owner of any existing utility. It is further suggested that the board in soliciting offers should have acted by ordinance rather than by resolution. We find nothing in the charter requiring such action to be by ordinance rather than by resolution. It is further suggested that under the provision of section 15 of chapter 1 of article II of the charter, this resolution should have been published for five successive days before final action thereon. It does not appear by the complaint that such publication was not had, but a complete answer to plaintiff's claim in this regard is that this resolution was not one coming within the purview of that section. It did not provide for any specific improvement, or the granting of a franchise or privilege, or the expenditure of public money, and did not levy any tax or assessment. We conclude, therefore, that there was a full compliance with the requirements of section 2 of article XII of the charter.

We concede the necessity for the determination by ordinance of the demands of public interest or necessity for "the acquisition, construction, or completion by the city and county" of the utility proposed to be acquired. The ordinance in this case ordained that "it is hereby determined and specifi-

cally declared that the public interest and necessity demand the construction of street-railways over and along the following streets," etc., and directed the board of public works to procure and file plans and estimates of cost. This determination, it will be observed, was in the precise form specified in section 5 of article XII of the charter, but it is not declared in terms that such construction so demanded is a construction *"by the city and county."* Upon the omission of these words learned counsel base a claim that the ordinance is void, it being contended that there was no adjudication by the board of the necessity of such construction *"by the city and county."* This ordinance was one of a series of essential steps in a proceeding provided for by the charter, leading up to the acquisition by the city and county of public utilities. The determination of the board expressed therein was in the form prescribed by the particular section relating to such ordinance, which sufficiently answers what is said by counsel as to the mode prescribed being the measure of power. Throughout the article of the charter relating to the acquisition of public utilities, the words "acquisition," "construction," and "completion" necessarily refer to an acquisition or construction or completion *"by the city and county."* The word "construction" could mean nothing else in the ordinance declaring the determination as to the demand of public interest and necessity therefor, especially where this declaration is followed therein by an order for plans and estimates of cost. We are satisfied that the ordinance sufficiently expressed the determination of the board that the public interest and necessity demand the construction of these street-railways *by the city and county.*

It is further urged that the ordinance was defective in that it confined the determination to one of necessity for the "construction" of street-railways, and did not include a determination of the necessity of the "acquisition" of an existing street-railway. It is said, "jurisdiction was never obtained, therefore, to acquire an existing utility." We fail to perceive the point of this, inasmuch as the bonded indebtedness authorized by the electors and proposed to be incurred is not, in whole or in part, for the acquisition by purchase of any existing utility. What is said by counsel in this connection is doubtless said upon the theory that such a determination was

essential to the validity of the resolution soliciting offers for sale of existing utilities, a matter to which we have already referred.

Of course, the word "construction" as used in this ordinance means the original construction of the street-railroads proposed to *completion*.

We are unable to perceive any irregularity in the matter of the calling for plans and estimates of cost of the proposed street-railway, or in the plans and estimates themselves. There was a description of the utility proposed to be constructed sufficient for the purpose in the resolution calling for plans and estimates. The plans submitted by the board of public works are not shown and there is no allegation of the complaint indicating them to be "meagre" or "inadequate." The ordinance of the board of supervisors determining that a bonded indebtedness is essential to the construction of such utilities sufficiently adopts the estimates of cost by the board of public works as its own.

The complaint alleges that the city and county has heretofore appropriated out of the current revenues in different years for the construction of a municipal railroad on Geary street, the aggregate sum of $1,395,000, being $350,000 in 1905, $325,000 in 1906, and $720,000 in 1907, none of which has ever been expended in the acquisition or construction or completion of said municipal street-railroad. It is urged that so far as current revenues are available, a bond issue is unauthorized. There is, however, no allegation that the moneys so collected are now in the possession or control of the city and county, or available for use in the construction of this utility. It must be presumed against the pleader that such money is not so available. It is asserted in an affidavit presented on the hearing of the application for an injunction that these moneys not having been used for the purpose of constructing a street-railroad, they were at the expiration of the respective fiscal years during which they were set apart for that purpose merged in the surplus fund of the city and county in accordance with the provisions of section 3 of chapter 2 of article III of the charter, and also that the city and county was perpetually enjoined by the superior court from using for such purpose the $720,000 set apart in 1907. While this affidavit may not be considered in the matter of the demurrer

to the complaint, it presents a theory not negatived thereby, affording a sufficient basis for holding that the complaint does not show that this money is available for the construction of these utilities.

The complaint alleges many facts as the basis of a claim that public interest or necessity does not demand that the city and county should construct any street-railroad, such as the existence in said city and county of street-railroads owned and operated by private corporations, furnishing "ample and adequate means of transportation" to the people thereof. It appears very clear that the determination of the question of public interest or necessity by the board of supervisors in a matter of this character is conclusive upon the courts, at least in the absence of fraud. As intimated by the learned trial judge, there is no material difference in this regard between such a determination and one by a board of supervisors to the effect that an ordinary public road, or street, or public ferry, is necessary, and it is well settled that the latter is not subject to review by the judicial department of the state. (See *Pool* v. *Simmons,* 134 Cal. 621, 625, [66 Pac. 872], and cases there cited; 1 Dillon on Municipal Corporations, secs. 94, 95.)

It is said that the ordinance provides for the construction of a road that will cover more than ten blocks occupied by another street-railway, and that it is therefore void under the city charter. Without admitting that such a condition would render the ordinance invalid, it is sufficient to say that it affirmatively appears from the allegations of the complaint that, if the existing road on Geary Street constructed under the franchise alleged to have been granted to Charles Main et al. on November 6, 1878, and assigned to the Geary Street, Park and Ocean Railroad, be excluded from consideration, there is no existing franchise for any ten *consecutive* blocks on the portions of any of the streets over which it is proposed to construct these railways. The Geary Street, Park and Ocean Railroad franchise is to be excluded from consideration because there is no allegation in the complaint tending to show that it has not expired by limitation. The pleader with scrupulous care has abstained from alleging, as in the case of the other franchises granted, the term for which this franchise was granted, and from appending to his complaint

a copy of the ordinance granting the same. But under well-settled rules of pleading we must assume, in the absence of allegations to the contrary, that the franchise has expired. If we assume that the charter provision (sub. 27, sec. 1, chap. 2, art. II, as amended February 5, 1903, Stats. 1903, p. 586) is applicable in the case of municipally owned street railways, it is clear that the utmost that can be claimed for it is that it precludes the authorization by the supervisors of the joint use by two or more street-railways of more than ten *consecutive* blocks of any street.

There is nothing in any of the ordinances granting franchises to private street-railroad corporations, copies of which ·are appended to plaintiff's complaint, which can be construed as purporting to apply to street-railroads owned and operated by the municipality. So far as the Sutro franchise covering six consecutive blocks on a portion of Point Lobos Avenue to be traversed by the municipal Geary Street railroad, is concerned, there is no provision whatever referring to the right of the board of supervisors in regard to grants by it to other corporations of privileges over the streets embraced therein, except the general provision that the rights and privileges granted shall be held and enjoyed, "upon such terms, conditions and restrictions as are now or may be hereafter imposed by the laws of the state of California."

The express prohibition of section 499 of the Civil Code against the occupation and use of the same street or track for a distance of more than five blocks by two lines of street-railway operated under different managements was eliminated by amendment in 1907 (Stats. 1907, p. 887), and the section now expressly permits two or more lines of street-railway, operated under different managements, by arrangement among themselves, to use the same streets or tracks for any distance exceeding five consecutive blocks, the use for not exceeding five consecutive blocks being authorized without any arrangement. As we understand the allegations of the complaint, the only joint use of a street in excess of five consecutive blocks by any two or more railway lines, in consequence of the construction of the proposed municipal railroads, will be that of one block on Point Lobos Avenue and that of two blocks on Market Street. Assuming solely for the purposes of this decision that section 499 of the Civil Code is applicable

to municipally owned and operated street-railroads, and also that it controls the charter provision above referred to, certainly we cannot assume in this proceeding to enjoin the incurring of the bonded indebtedness proposed, that arrangements have not or cannot be made that will permit such a use as is authorized thereby.

We see nothing in the allegations as to existing franchises that can be held to preclude the issuance of the proposed bonds.

No other points are made in the briefs against the proposed bond issue.

Whatever basis there may be for the doubts expressed as to the wisdom of the policy of the acquisition and operation by the city and county of San Francisco of the proposed municipally owned street railways, we have no doubt that the city and county has the power to construct and operate the same and the power to incur a bonded indebtedness for such purpose, and also that the proceedings in that behalf presented for review on this appeal are free from substantial irregularity. It necessarily follows that the conclusion of the trial court was correct.

The judgment is affirmed, as is also the order denying plaintiff's motion for an injunction.

Shaw, J., Sloss, J., Lorigan, J., Melvin, J., and Henshaw, J., concurred.